UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ERICA MELVIN as Administratrix of the
Estate of RASHAD MCNULTY, Deceased,

                              Plaintiff,

        v.

COUNTY OF WESTCHESTER; CORRECT
CARE SOLUTIONS, LLC; NEW YORK
CORRECT CARE SOLUTIONS MEDICAL
SERVICES PC; EMPRESS AMBULANCE
SERVICE, INC.; RAUL ULLOA;
PAULETTE SMITH; JOSH BOGGI; DIANE
JORDAN; GREGORIO CASTRO; and
EMS JOHN DOE,

                              Defendants.

Case No. 14-CV-2995 (KMK)

OPINION & ORDER

Appearances:

Jared R. Rice, Esq.
Rice & Rice Attorneys At Law
Bronx, NY
*Counsel for Plaintiff*

John M. Murtagh, Jr., Esq.
Denise M. Cossu, Esq.
Gaines, Novick, Ponzini, Cossu & Venditti, LLP
White Plains, NY
*Counsel for Defendants County of Westchester, Correct Care Solutions, LLC, New York Correct
Care Solutions Medical Services PC, Raul Ulloa, Paulette Smith, Josh Boggi, and Diane Jordan*

Ryan T. Cox, Esq.
Joseph L. DeMarzo, Esq.
Martin Clearwater & Bell LLP
New York, NY
*Counsel for Defendants Empress Ambulance Service Inc. and Gregorio Castro*

KENNETH M. KARAS, District Judge:

Erica Melvin ("Plaintiff"), as administratrix of the estate of Rashad McNulty, deceased, brings this Second Amended Complaint against the County of Westchester ("Westchester"), Correct Care Solutions, LCC ("CCS"), New York Correct Care Solutions Medical Services, PC ("NYCCS"), Dr. Raul Ulloa ("Ulloa"), Paulette Smith ("Smith"), Josh Boggi ("Boggi"), Diane Jordan ("Jordan"), Empress Ambulance Service, Inc. ("Empress"), and Gregorio Castro ("Castro") (collectively, "Defendants").  (Dkt. No. 53.)  Before the Court are two Motions To Dismiss Plaintiff's Second Amended Complaint, one on behalf of Westchester, CCS, NYCCS, Ulloa, Smith, Boggi, and Jordan (collectively, "Westchester Defendants"), and one on behalf of Empress and Castro (collectively, "Empress Defendants").  (Dkt. Nos. 63, 66.)  For the following reasons, Empress Defendants' Motion is granted and Westchester Defendants' Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Second Amended Complaint and are taken as true for the purpose of resolving the instant Motions.

#### 1.  Events Preceding Decedent's Confinement at WCJ

A Civil Rights of Institutionalized Persons Act ("CRIPA") investigation was performed at Westchester County Jail ("WCJ") in February 2008.  (Second Am. Compl. ("SAC") ¶ 18 (Dkt. No. 53).)  On November 19, 2009, the Department of Justice ("DOJ") issued a Findings Letter to Westchester regarding certain conditions at WCJ.  (*Id.*)  DOJ ultimately concluded that WCJ inmates did not receive adequate medical care.  (*Id.*)

Between May 6, 2008 and July 25, 2010, Westchester County Health Care Corporation ("WCHCC") provided medical care and treatment to inmates at WCJ, pursuant to an agreement with Westchester ("Westchester-WCHCC Contract"). (*Id.* ¶ 17.) On or about January 27, 2010, WCHCC notified Westchester of its intention to terminate the agreement effective as of midnight on July 26, 2010. (*Id.* ¶ 23.) Westchester accepted that withdrawal and, on June 16, 2010, entered into a contract with CCS and NYCCS for the provision of comprehensive health care to WCJ inmates and detainees ("Westchester-NYCCS Contract"). (*Id.* ¶¶ 26, 31.) That relationship began on or about July 26, 2010 and continued through the events giving rise to this Action. (*Id.* ¶ 32.)

As of January 2013, Westchester, CCS, and NYCSS had an agreement with Empress to provide after-care transportation for WCJ inmates and detainees ("NYCCS-Empress Contract"). (*Id.* ¶ 34.)

### 2. Events Relating to Decedent's Medical Care at WCJ

Rashad McNulty ("Decedent") was confined to WCJ on August 9, 2011 and incarcerated there until the time of his death on January 29, 2013 ("January 29"). (*Id.* ¶ 37.) Shortly after arriving at WCJ, Decedent underwent a medical intake screening process and health assessment that showed he had a normal blood pressure reading. (*Id.*)

On January 16, 2013 ("January 16"), a chest X-ray was performed on Decedent due to his complaints of chest pains. (*Id.* ¶ 39) No tests for stenosing coronary arteriosclerosis or any other blood circulation abnormalities were performed at that time. (*Id.*) Ulloa, the Medical Director at WCJ, received the results of Decedent's X-ray on January 18, 2013. (*Id.* ¶ 40.) He did not perform or order any follow-up tests. (*Id.*)

3

At approximately 2:00 a.m. on January 29, 2013, Decedent again complained of chest pains, informing Officer Kevin Grant ("Grant") that he was feeling discomfort in his chest.  (*Id.* ¶ 41).  Twelve minutes later, Decedent was taken to the Booking Nursing Station where a simple health assessment was performed by Boggi, a WCJ nurse.  (*Id.* ¶ 42).  The assessment revealed that Decedent had abnormally high blood pressure and a very low pulse rate.  (*Id.*)  Between approximately 2:12 a.m. and 2:37 a.m., Boggi did not place Decedent on a heart monitor, did not provide him with oxygen, an intravenous line, or nitroglycerin, did not consider a differential diagnosis, and did not call Empress for transportation to Westchester Medical Center ("WMC").  (*Id.* ¶ 44.)  At approximately 2:37 a.m., Boggi called Ulloa to inform him of the findings of the assessment.  (*Id.* ¶ 45.)  Boggi and Ulloa discussed that Decedent had experienced the same chest discomfort a few nights prior.  (*Id.*)  During the telephone call, Ulloa instructed Boggi to provide Decedent with Zantac and Mylanta to treat indigestion.  (*Id.* ¶ 46.)

At approximately 3:00 a.m., Decedent was sent to the clinic to receive these medications.  (*Id.* ¶ 47).  He was squealing in pain and said to Smith, another nurse at WCJ, that he did not want to die.  (*Id.*)  At approximately 3:24 a.m., Decedent was transported to the booking area of WCJ, where he was monitored and observed by Boggi.  (*Id.* ¶ 48.)  After Boggi and Smith determined that Decedent was well enough to return to his cell, he was sent back to his cell at approximately 4:16 a.m.  (*Id.* ¶ 49.)  Nine minutes later, Boggi, Smith, and Jordan, also a nurse at WCJ, responded to a "Signal 3" alert and discovered Decedent lying on the floor of the hallway after having collapsed.  (*Id.* ¶ 50.)  Decedent was non-verbal and dazed at this time, (*id.*), and Boggi characterized his low pulse readings as "not good," (*id.* ¶ 51 (internal quotation marks omitted)).  Smith told Decedent to get up and attempted to pull him up by his arm several times.  (*Id.* ¶ 52.)  Decedent was eventually able to lift himself up into a wheelchair, after which

Smith accused Decedent of trickery and expressed doubt that he had a serious medical concern. (*Id.*)  She stated, "I've been doing this too long to be fooled," "that's the oldest trick in corrections, he's not going to the clinic, he's going to his cell," and "that's the oldest trick in the book."  (*Id.*)  At approximately 4:30 a.m., Smith transported Decedent to his cell, (*id.* ¶ 53), where he was moaning in pain, (*id.* ¶ 54).

When Decedent became unresponsive at around 5:00 a.m., Grant called Smith to inform her of Decedent's current condition.  (*Id.* ¶ 55.)  At approximately 5:05 a.m., Smith arrived at Decedent's cell and observed that he was still unresponsive.  (*Id.* ¶ 56.)  She then entered his cell, provided some degree of medical treatment, and ordered that another "Signal 3" alert be announced.  (*Id.*)  At approximately 5:09 a.m., Jordan arrived at Decedent's cell to assist Smith. (*Id.* ¶ 57.)  Smith called Ulloa, who was not present at WCJ, to alert him that Decedent was unconscious.  (*Id.*)

At approximately 5:12 a.m., Smith instructed Captain Francis Delgrosso ("Delgrosso") to call 911.  (*Id.* ¶ 58.)  Three minutes later, Empress dispatched an ambulance from its station in Yonkers, located 11 miles from WCJ.  (*Id.* ¶ 59.)  At approximately 5:16 a.m., Boggi arrived at Decedent's cell to provide medical treatment to Decedent alongside Smith and Jordan.  (*Id.* ¶ 60.)  At 5:38 a.m., Castro and EMS John Doe, emergency medical service providers employed by Empress, arrived at WCJ and unsuccessfully attempted to have Decedent regain consciousness.  (*Id.* ¶ 61.)  Thereafter, Empress transported Decedent to WMC, where medical staff unsuccessfully attempted to have him regain consciousness.  (*Id.* ¶ 62.)  Decedent was declared dead at 6:16 a.m.  (*Id.*)  The autopsy listed his cause of death as stenosing coronary arteriosclerosis.  (*Id.* ¶ 65.)

In the evening of January 29, Smith called Boggi to discuss the events surrounding Decedent's death and made clear that the nurses needed to "stick together." (*Id.* ¶ 63.)  When Smith again called Boggi later that evening, he did not answer her calls.  (*Id.*)

B. Procedural Background

Plaintiff commenced the instant Action on April 28, 2014, (Dkt. No. 1), and filed her Amended Complaint on July 25, 2014, (Dkt. No. 31).[1]  Plaintiff then filed her Second Amended Complaint on December 8, 2014.  (Dkt. No. 53.)

Pursuant to a Scheduling Order adopted by the Court on February 26, 2015, (Dkt. No. 57), Westchester Defendants submitted their Motion To Dismiss and supporting papers on April 17, 2015, (Dkt. Nos. 63–65.)  That same day, Empress Defendants submitted their own Motion To Dismiss and supporting papers, which included a Verified Answer to Plaintiff's Second Amended Complaint.  (Dkt. Nos. 66–68.)  Plaintiff filed her opposition papers to Westchester Defendants' Motion on June 12, 2015, (Dkt. Nos. 82–83), and her opposition papers to Empress Defendants' Motion on June 30, 2015, (Dkt. Nos. 89–90).  Westchester Defendants submitted their reply on July 2, 2015, (Dkt. No. 92), and Empress Defendants submitted their reply on July 9, 2015, (Dkt. No. 98).  The Court denied Plaintiff's application for leave to file a sur-reply in opposition to the Motions.  (Dkt. No. 97.)

II.  Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of

---

[1] A Notice of Claim pursuant to New York General Municipal Law § 50-e was timely served on Westchester on March 13, 2013.  (SAC ¶ 66.)  An amended Notice of Claim was served on March 26, 2014.  (*Id.*)

his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alterations, citations, and internal quotation marks omitted).[2]  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (internal quotation marks and alterations omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era,

---

[2] While Empress Defendants have indicated their intent to seek relief under Federal Rule of Civil Procedure 12(c), because an Answer to Plaintiff's Second Amended Complaint had previously been served, (*see* Dkt. No. 79), that distinction ultimately has no bearing on the Court's present analysis.  "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Hogan v. Fischer*, 738 F.3d 509, 514–15 (2d Cir. 2013) (internal quotation marks omitted).

but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In addition, "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (alterations and internal quotation marks omitted)).  Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

Lastly, "[i]n ruling on a 12(b)(6) motion, . . . a court may consider the complaint[,] . . . any written instrument attached to the complaint as an exhibit[,] or any statements or documents incorporated in it by reference," as well as "matters of which judicial notice may be taken, and documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (alterations and internal quotation marks omitted); *see also Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal quotation marks omitted)).

B. <u>Deliberate Indifference Claims</u>

Plaintiff alleges that "on January 29, 2013 [Decedent] presented a severe and urgent medical need that posed a sufficiently serious risk of death that was not treated with adequate medical care by . . . Ulloa, Boggi, Smith, Jordan, Castro[,] and EMS John Doe." (SAC ¶ 77.) According to the Second Amended Complaint, these Defendants "knew of and recklessly disregarded a substantial risk of serious harm to [Decedent's] health and safety despite obvious indications that he was suffering from a heart attack." (*Id.* ¶ 78.)

1. <u>Applicable Law</u>

"The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks omitted). "There are two elements to a claim of deliberate indifference to a serious medical condition." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (internal quotation marks omitted). Under this objective requirement, a court must inquire first, "whether the prisoner was actually deprived of adequate medical care," and second, "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006). The latter requires the Court "to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280. As part of this objective element, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the

9

Second Circuit has presented "a non-exhaustive list" of factors to consider:  "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'"  *Id.*; *see also Morales v. Fischer*, 46 F. Supp. 3d 239, 247 (W.D.N.Y. 2014) (same).

 "The second requirement is subjective:  the charged officials must be subjectively reckless in their denial of medical care."  *Spavone*, 719 F.3d at 138.  Here, the inquiry is whether defendants "knew of and disregarded an excessive risk to [a plaintiff's] health or safety" while "both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference."  *Caiozzo*, 581 F.3d at 72 (alterations and internal quotation marks omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference.").  "Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."  *Nielsen*, 746 F.3d at 63 (internal quotation marks omitted); *see also Gladden v. City of N.Y.*, No. 12-CV-7822, 2013 WL 4647193, at *2 (S.D.N.Y. Aug. 29, 2013) ("To meet the subjective element, the plaintiff must show that the defendant acted with more than mere negligence, and instead knew of and disregarded an excessive risk to inmate health or safety." (internal quotation marks omitted)).  In contrast, "mere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., . . . a conscious disregard of a substantial risk of serious harm."  *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (internal quotation marks omitted).  Moreover, "mere disagreement over the proper

10

treatment does not create a constitutional claim," and "so long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*; *see also Crique v. Magill*, No. 12-CV-3345, 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) ("The mere fact that an inmate feels that he did not receive adequate attention . . . does not constitute deliberate indifference.").

    2.  <u>Analysis</u>

    The first question, then, is whether Decedent's condition was sufficiently serious under the objective prong of the deliberate indifference standard. Accepting Plaintiff's allegations as true, this Court concludes that it was.

    "[S]evere chest pain, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard." *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005); *see also Flemming v. Velardi*, No. 02-CV-4113, 2003 WL 21756108, at *2 (S.D.N.Y. July 30, 2003) (recognizing that "a severe heart condition can be sufficiently serious" (internal quotation marks omitted)).[3] While chest pains alone generally do not constitute a sufficiently serious medical condition for purposes of a deliberate indifference claim, *see, e.g.*, *Hutchinson v. N.Y. State Corr. Officers*, No. 02-CV-2407, 2003 WL 22056997, at *5 (S.D.N.Y. Sept. 4, 2003) (holding the plaintiffs' allegation "that [the decedent] was experiencing 'chest pains' . . . does not constitute a sufficiently serious condition"

---

    [3] Some courts have suggested that only "[d]iagnosed heart conditions or disease have been recognized as a serious medical condition." *Bruno v. Wright*, No. 06-CV-808, 2008 WL 5100278, at *6 (N.D.N.Y. Nov. 26, 2008); *see also Bennett v. Hunter*, No. 02-CV-1365, 2006 WL 1174309, at *3 (N.D.N.Y. May 1, 2006) (noting that, "[d]epending on the precise nature of the disease, generally a heart *condition*" will constitute a serious medical need (emphasis added)). In this regard, it bears noting that the autopsy of Decedent listed his cause of death as coronary arteriosclerosis, (SAC ¶ 65), a recognized heart disease, *see* M. Gabriel Khan, *Encyclopedia of Heart Diseases* 101–03 (2005).

(citation omitted)); *Flemming*, 2003 WL 21756108, at *2  (finding mere allegations of "chest pains" and "discomfort" insufficient to trigger an Eighth Amendment claim (internal quotation marks omitted)), the Second Amended Complaint alleges that on January 29 Plaintiff suffered not only chest pains, but also "abnormally high blood pressure" and "a very low pulse rate," (SAC ¶ 42).  This combination of symptoms, along with the allegations of substantial pain, (*see, e.g.*, *id.* ¶ 47 (alleging Decedent "was squealing in pain")), establishes Decedent's medical condition as sufficiently serious under the objective prong, *see Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (finding the objective prong satisfied by "evidence that [an inmate] suffered from severe chest pain which he reasonabl[y] believed was caused by a heart attack"); *Escobar v. Reid*, 668 F. Supp. 2d 1260, 1310 (D. Colo. 2009) (finding the "[p]laintiff's allegations that he suffered severe chest pains over the period of several hours [were] sufficient to establish that his medical condition was objectively sufficiently serious"); *Adams v. Franklin*, 111 F. Supp. 2d 1255, 1270 (M.D. Ala. 2000) (finding the "[p]laintiff's medical needs were sufficiently serious" based on his allegations "that he was suffering from chest pains and shortness of breath"); *Mandala v. Coughlin*, 920 F. Supp. 342, 353 (E.D.N.Y. 1996) (noting that "ignoring a prisoner's complaints of chest pains where the prisoner later died of a heart attack" has been found to constitute a serious medical need).

Turing to the subjective prong, the Court next must determine whether Defendants were deliberately indifferent to that serious medical need.  While unable to state a claim against either Ulloa or Castro, Plaintiff has pled sufficient facts suggesting Boggi, Smith, and Jordan acted with the requisite mental culpability.

a.   <u>Ulloa, Boggi, Smith, and Jordan</u>

The Second Amended Complaint asserts that Ulloa, Boggi, Smith, and Jordan were deliberately indifferent in "denying [Decedent] lifesaving medical treatment and wheeling him to his cell to die." (SAC ¶ 79.) Specifically, Plaintiff alleges that Decedent (i) was "denied access to a heart monitor, oxygen, intravenous fluids, nitroglycerin, a physical examination from a doctor, and emergency medical services from third party medical professionals" on the morning of January 29, (Pl.'s Opp'n to Westchester Defs.' Mot. to Dismiss ("Pl.'s Opp'n to Westchester Defs.") 12–13 (Dkt. No. 83) (citing SAC ¶¶ 42, 44–45)), (ii) "was recklessly discharged from the care of . . . [D]efendants and sent back to his cell," (*id.* at 13 (citing SAC ¶ 49)), and (iii) "was left alone in his cell with absolutely no medical care . . . as he was moaning and agonizing in pain," (*id.* at 13–14 (citing SAC ¶ 49)). The Court addresses these allegations in chronological order, ultimately concluding Plaintiff has plausibly pled deliberate indifference on the part Boggi, Smith, and Jordan. As to Ulloa, however, the Second Amended Complaint fails to satisfy the subjective prong.

First, Plaintiff alleges that a denial of medical care occurred on January 29, between 2:12 a.m. and 2:37 a.m., when Boggi performed "a simple health assessment" of Decedent in response to his complaint of chest pains. (SAC ¶ 42.) The Second Amended Complaint faults Boggi for failing to place Decedent on a heart monitor, provide him with nitroglycerin or oxygen, "consider a differential diagnosis that would include chest pain secondary to an acute obstructive coronary artery syndrome," or call an ambulance. (*Id.* ¶ 44.) While Plaintiff has not pled that Boggi even had authority to make such medical decisions, *see Jacoby v. Cty. of Oneida*, No. 05-CV-1254, 2009 WL 2971537, at *4 (N.D.N.Y. Sept. 11, 2009) (dismissing deliberate indifference claim against a nurse who "lacked the authority to make medical decisions directly

related to [the] [p]laintiff"), the facts nonetheless fail to suggest that at this point Boggi was "*actually aware* of a substantial risk" to Decedent's health, *Nielsen*, 746 F.3d at 63 (emphasis added) (internal quotation marks omitted).  That Decedent had previously complained of chest pains on January 16, (*see* SAC ¶ 39), on its own, does not give rise to an inference that Defendants had prior knowledge of an excessive risk to his health or safety, *cf. Kidkarndee v. Koenigsmann*, No. 12-CV-502, 2014 WL 1239319, at *15 (N.D.N.Y. Mar. 25, 2014) (dismissing deliberate indifference where the plaintiff complained of chest pains for a third time but "neither [prior] hospital visitation produced diagnoses of a heart attack").  Plaintiff alleges no other symptoms accompanying the original "complaints of chest pains" on January 16 that would suggest more than an isolated incident of discomfort, (*see* SAC ¶ 39), nor does she allege that Decedent continued to complain after he received medical attention on that occasion or during the two weeks leading up to his second complaint of chest discomfort, (*see generally id.* ¶¶ 39–41).  Furthermore, there is no allegation that Decedent had a diagnosed heart condition.  While the Second Amended Complaint notes that no tests apart from a chest X-ray were performed on January 16 and no follow-up tests were performed after Ulloa received the results of the X-ray, (*see id.* ¶¶ 39–40), Plaintiff's disagreements with the diagnostic techniques and treatment by medical personnel cannot form the basis for a § 1983 claim.  These are precisely the sorts of "issues [that] implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment."  *Whitfield v. O'Connell*, No. 09-CV-1925, 2010 WL 1010060, at *7 (S.D.N.Y. Mar. 18, 2010) (internal quotation marks omitted), *aff'd*, 402 F. App'x 563 (2d Cir. 2010); *see also Jones v. Vives*, 523 F. App'x 48, 50 (2d Cir. 2013) (finding a doctor's treatment of an inmate's broken hand with Motrin and failure to order X-ray until several days later was an issue of medical judgment that could not support a § 1983 claim).

14

Indeed, Plaintiff at no point even alleges that the results of the X-ray warranted any follow-up by medical personnel.

Notably, the Second Amended Complaint is devoid of any allegation that Decedent knew he had a heart condition, that he had been previously diagnosed with a heart condition, or that he had ever reported a heart condition to WCJ medical personnel prior to these incidents.[4] Although awareness may be proven "from the very fact that the risk was obvious," *Farmer*, 511 U.S. at 842; *see also McMillian v. Cty. of Onondaga*, No. 13-CV-1124, 2015 WL 1403459, at *19 (N.D.N.Y. Mar. 26, 2015) ("A plaintiff . . . must show that the official was aware of facts from which one could infer that a substantial risk of serious harm exists."), it cannot be said such a risk was obvious based only on Decedent's "feeling discomfort in his chest," (SAC ¶ 41), accompanied by high blood pressure and a low pulse rate, (*id.* ¶ 42), but nothing more, *compare McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (concluding that a plaintiff who claimed prison officials failed to treat him for chest pains did not state an Eighth Amendment claim of deliberate indifference), *with Buffaloe v. Fein*, No. 12-CV-9469, 2013 WL 3471060, at *1–2 (S.D.N.Y. July 11, 2013) (report and recommendation) (finding both prongs of the deliberate indifference standard satisfied where a prison official allegedly "denied [the plaintiff] access to a cardiologist despite being aware of his worsening cardiac condition" where the plaintiff had experienced complications from heart surgery he underwent prior to his placement in that prison).  Thus, that Boggi, Smith, or Jordan presumably knew of the earlier complaint of chest pains does not give rise to the inference that Defendants knew, prior to January 29, of an "excessive risk" to Decedent's health, *see Farmer*, 511 U.S. at 837; *Brown v. Jeanty*, No. 03-

---

[4] In fact, the Second Amended Complaint notes that Decedent's initial health assessment showed nothing more than a normal blood pressure reading.  (SAC ¶ 37.)

CV-8712, 2009 WL 6065754, at *9 (S.D.N.Y. July 23, 2009) (finding "the severe nature of [the plaintiff's] injuries was not apparent enough to provide notice of a substantial risk of serious harm"), *adopted by* 2010 WL 1047651 (S.D.N.Y. Mar. 22, 2010), or that specific medical treatment, such as administration of nitroglycerin or oxygen, was deliberately or recklessly withheld at this point, *see Washington v. Westchester Cty. Dep't of Corr.*, No. 13-CV-5322, 2014 WL 1778410, at *7 (S.D.N.Y. Apr. 25, 2014) (finding the plaintiff "failed to plead deliberate indifference" by "fail[ing] to allege any facts demonstrating that [the] [d]efendants deliberately withheld his medication"); *Baskerville v. Blot*, 224 F. Supp. 2d 723, 735–36 (S.D.N.Y. 2002) ("[B]ecause [the plaintiff's] assertions do not show that [the defendant] acted intentionally to withhold from him his prescribed medication . . . , he has failed to state an Eighth Amendment claim of deliberate indifference to a serious medical need."); *Joyner v. Greiner*, 195 F. Supp. 2d 500, 503 (S.D.N.Y. 2002) (explaining that the subjective prong requires "some evidence that the health care providers knowingly and intentionally rendered improper treatment" (citing *Farmer*, 511 U.S. at 837)).

Without any prior knowledge, the complained-of decisions by Boggi prior to 4:25 a.m. are not "instances of . . . Decedent's being deprived of adequate medical care," (Pl.'s Opp'n to Westchester Defs. 12), but rather the sort of disputes that do not amount to constitutional violations, *see Whitfield*, 2010 WL 1010060, at *7 ("Disagreements over medications, diagnostic techniques, forms of treatment, or the need for specialists[,] or the timing of their intervention, are not adequate grounds for a [§] 1983 claim." (alterations and internal quotation marks omitted)); *Burke v. Pillai*, No. 14-CV-1680, 2015 WL 1565413, at *6 (D. Conn. Apr. 8, 2015) ("[A]lthough the provision of medical care by prison officials is not discretionary, the type and amount of medical treatment *is* discretionary." (emphasis added) (internal quotation marks

omitted)).  Plaintiff's insistence that Defendants should have conducted further tests at this early

stage, at best, states a claim for medical negligence, which is not actionable under §1983.  *See,*

*e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("[T]he question whether an X-ray or additional

diagnostic techniques or forms of treatment is indicated is a classic example of a matter for

medical judgment.  A medical decision not to order an X-ray, or like measures, does not

represent cruel and unusual punishment."); *O'Diah v. Mawhir*, No. 08-CV-322, 2012 WL

4482579, at *9 (N.D.N.Y. Sept. 5, 2012) (finding no Eighth Amendment violation where the

plaintiff alleged that "different or additional tests should have been run or medication

prescribed"), *adopted by* 2012 WL 4471183 (N.D.N.Y. Sept. 26, 2012); *Joyner*, 195 F. Supp. 2d

at 504–05 (finding a doctor's refusal to order an MRI not actionable under the Eighth

Amendment).  Indeed, "treatment of a prisoner's medical condition generally defeats a claim of

deliberate indifference."  *Peterson v. Miller*, No. 04-CV-797, 2007 WL 2071743, at *10

(N.D.N.Y. July 13, 2007) (internal quotation marks omitted); *see also Johnson v. Wright*, 234 F.

Supp. 2d 352, 361 (S.D.N.Y. 2002) ("Generally, where the dispute concerns not the absence of

help, but the choice of a certain course of treatment[,] a court will not second guess the [medical

personnel]." (alterations and internal quotation marks omitted)).  Between 2:12 a.m. and 2:37

a.m., Boggi not only performed a health assessment of Decedent but also called Ulloa within

minutes of noting Decedent's irregular blood pressure and pulse, so as to advise him of the

findings of that assessment and, presumably, to discuss the next steps in Decedent's treatment.

(SAC ¶¶ 45–46.)  There is thus no outright denial of care alleged here, and nor are there

accompanying facts from which it can be inferred that Boggi knew of and disregarded a

substantial risk of serious harm to Decedent.  Notwithstanding the tragic loss of life that

ultimately resulted, it bears noting that the benefit of hindsight cannot support a claim of

deliberate indifference to a serious medical need that was unknown at the time of treatment.  *See Figueroa v. Semple*, No. 12-CV-982, 2015 WL 3444319, at *5 (D. Conn. May 28, 2015) ("Although the injuries suffered by the plaintiff provide the [c]ourt with the benefit of hindsight, they do not show that, at the time of the incident in question, the defendants disregarded an excessive risk to the plaintiff's safety."); *Wise v. Ranck*, No. 07-CV-1899, 2008 WL 4861974, at *3 (M.D. Pa. Nov. 6, 2008) ("[D]eliberate indifference must be viewed from the prison official's perspective at the time in question, not with hindsight's perfect vision."), *reconsideration denied*, 2009 WL 1458106 (May 26, 2009).

Plaintiff's next allegation of deliberate indifference rests upon Ulloa's misdiagnosis of indigestion and prescribed course of treatment between 2:37 a.m. and 3:00 a.m.  (*See* SAC ¶¶ 45–47.)  However, a "complaint that a physician has been negligent in diagnosing or treating a [prisoner's] medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."  *Estelle*, 429 U.S. at 106; *see also Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *Harris v. Westchester Cty. Med. Ctr.*, No. 08-CV-1128, 2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) (holding that allegations of misdiagnosis, "without more," do not state a cause of action under the Eighth Amendment). That is precisely the case in the instant Action, where, according to Second Amended Complaint, "Ulloa *negligently* instructed . . . Boggi to provide [Decedent] with Zantac and Mylanta for what was misdiagnosed as indigestion."  (SAC ¶ 46 (emphasis added).)[5]  This allegation falls far short

---

[5] Plaintiff herself concedes "it is arguable that . . . Decedent being denied access to a heart monitor, oxygen, intravenous fluids, nitroglycerin, a physical examination from a doctor, and emergency medical services from third[-]party medical professionals, and instead prescribed

of the "culpable recklessness" required under the deliberate indifference standard, *Chance*, 143

F.3d at 703; *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("Deliberate

indifference is a state of mind that is the equivalent of criminal recklessness." (internal quotation

marks omitted)), whereby a complaint must allege a defendant "act[ed] or fail[ed] to act while

actually aware of a substantial risk that serious inmate harm will result," *Salahuddin*, 467 F.3d at

280 (*citing Farmer*, 511 U.S. at 836–37); *see also Beaman v. Unger*, 838 F. Supp. 2d 108, 110

(W.D.N.Y. 2011) ("The most that [the plaintiff's] allegations show, however, is that the

[defendants] misdiagnosed his injuries, and failed to recognize the severity of those injuries.

Such allegations might conceivably show malpractice, but they do not state an Eighth

Amendment claim." (citations omitted)); *Woodhull v. Cty. of Kent*, No. 04-CV-203, 2006 WL

2228986, at *10 (W.D. Mich. Aug. 3, 2006) (rejecting claim of deliberate indifference where the

defendant possibly committed malpractice in failing to recognize the severity of an inmate's

seizure condition that ultimately resulted in his death); *Thomas v. Wright*, No. 99-CV-2071, 2002

WL 31309190, at *8–9 (N.D.N.Y. 2002) (holding that, "[a]lthough they may have failed to

diagnose or even detect his cancer," the defendants did not act with "deliberate indifference"

because they "ordered medical tests, prescribed courses of treatments, and monitored his

laboratory and radiological reports"); *Ortiz v. Makram*, No. 96-CV-3285, 2000 WL 1876667, at

*9 (S.D.N.Y. Dec. 21, 2000) (finding no constitutional claim where the plaintiff alleged that

medical personnel misdiagnosed his kidney pain).

---

Mylanta and Zantac is a misdiagnosis." (Pl.'s Opp'n to Westchester Defs. 14.)  As her only
caveat to this acknowledgement, she states that "it is still plausible that he was denied access at
this time."  (*Id.*)  But, in doing so, Plaintiff misses the point, for whether Decedent should have
had "access" to different treatment is, to reiterate, not actionable under the Eight Amendment.
*See Estelle*, 429 U.S. at 107; *O'Diah*, 2012 WL 4482579, at *9.

The Second Amended Complaint alleges that "[Decedent] was then recklessly sent back to his cell at approximately 4:16 a.m.," (SAC ¶ 49), having been "monitored and observed by . . . Boggi" after he received the prescribed medication, (*id.* ¶¶ 47–48).  Plaintiff further asserts that Boggi and Smith acted "with complete indifference to [Decedent's] needs" in "determin[ing] that he was well enough to be sent back to his cell."  (*Id.* ¶ 49.)  The Court, however, need not accept Plaintiff's legal conclusions as to Defendants' states of mind, *see Iqbal*, 556 U.S. at 678 (reaffirming that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"); *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 41 F. Supp. 3d 411, 414 (S.D.N.Y. 2014) (determining that the plaintiff's assertion as to the defendant's recklessness "is merely a legal conclusion and therefore must be disregarded"); *Banks v. United States*, No. 10-CV-6613, 2011 WL 4100454, at *16 (S.D.N.Y. Sept. 15, 2011) ("[p]utting aside [the] plaintiff's repeated legal conclusions that various defendants were 'negligent' or demonstrated 'deliberate indifference'"), *adopted by* 2011 WL 5454550 (S.D.N.Y. Nov. 9, 2011), and instead focuses solely on the factual allegations contained in the Second Amended Complaint.  As alleged, "Decedent's chest pains," (SAC ¶ 49), even coupled with his low pulse and high blood pressure, do not suggest Defendants were at this time aware of a substantial risk of serious harm, let alone that they knowingly disregarded such a risk, *see Brown*, 2009 WL 6065754, at *9 ("Without such notice [of the severity of the inmate's injuries], [the defendant] could not have acted with deliberate indifference"); *McCoy*, 255 F. Supp. 2d at 260 (holding "that [the defendant] kept [the plaintiff] waiting for twenty-five minutes and then sent him back to his cell without treating his chest pains does not amount to a constitutional deprivation" where the plaintiff failed to allege, inter alia, "that [the defendant] subjectively exhibited a deliberate indifference to his medical condition").  "The [second]

20

deliberate indifference prong sets a high bar," *Bouknight v. Yee-Cheen Doung*, No. 09-CV-5817, 2011 WL 2682103, at *5 (S.D.N.Y. July 8, 2011); *see also Hot v. Carmel Cent. Sch. Dist.*, 994 F. Supp. 225, 228 (S.D.N.Y. 1998) ("The deliberate indifference standard is a high one."), which the facts alleged by Plaintiff have not yet reached.

Lastly, Plaintiff alleges a complete denial of care between 4:25 a.m. and 5:00 a.m., (*see* SAC ¶¶ 50–54), after "Boggi, Smith, and Jordan responded to a 'Signal 3' alert and found . . . Decedent lying on the floor of the hallway," (*id.* ¶ 50). At approximately 4:30 a.m., Smith "recklessly transported" Decedent to his cell "instead of to a medical facility" and, in doing so, "intentionally interfered" with his medical treatment while Boggi and Jordan recklessly failed to "interven[e] and . . . make appropriate accommodations for . . . Decedent to urgently receive medical care at a medical facility." (*Id.* ¶ 53.) In alleging that "Boggi, Smith, and Jordan recklessly failed to provide . . . Decedent with *any* medical treatment," (*id.* ¶ 54 (emphasis added)), the Second Amended Complaint puts forth a plausible claim of deliberate indifference, *see Harding v. Kuhlmann*, 588 F. Supp. 1315, 1316 (S.D.N.Y. 1984) ("Deliberate indifference, the second essential element, is properly pleaded by allegations," inter alia, "of 'complete denial' of medical treatment . . . ."), *aff'd*, 762 F.2d 990 (2d Cir. 1985); *accord Hilton v. Wright*, 928 F. Supp. 2d 530, 547 (N.D.N.Y. 2013) ("When the alleged deprivation is that the defendant failed to provide *any* treatment for the medical condition, 'courts examine whether the inmate's medical condition is sufficiently serious.'" (emphasis in original) (quoting *Salahuddin*, 467 F.3d at 280)).

By 4:25 a.m., Decedent's chest pains had persisted for over two hours and apparently had not been relieved by the prescribed medication. (*See* SAC ¶ 50 (alleging that at approximately 4:25 a.m. "Decedent was non-verbal and dazed" after "collapsing from feeling dizzy").) To the

contrary, it seems clear that his condition had worsened over the course of the morning, given that "he collapsed, was dazed, [and] had low pulse readings that . . . Boggi characterized as 'not good' . . . ." (*Id.* ¶ 51.) Boggi, Smith, and Jordan, however, took no "reasonable measures to abate [the risk of serious harm]," *Farmer*, 511 U.S. at 847; *see also Johnson*, 234 F. Supp. 2d at 360 ("Although federal courts are reluctant to second guess medical judgments and constitutionalize medical malpractice claims where the prisoner has actually received medical treatment, deliberate indifference will be found where the medical attention rendered was so woefully inadequate as to amount to no treatment at all." (alterations and internal quotation marks and citations omitted)); indeed, they did not provide him with *any* care.[6] Despite the evident incorrectness of the initial diagnosis, Boggi, Smith, and Jordan sent Decedent back to his cell, leaving him "moaning and agonizing in pain while he was having a fatal heart attack." (SAC ¶ 54.) *See Baptiste v. Warden at Ottisville, FCI N.Y.*, No. 09-CV-5523, 2010 WL 3185748, at *8 (S.D.N.Y. Aug. 11, 2010) (finding the plaintiff's claims "sufficiently plausible to survive a motion to dismiss" where he alleged that the defendant doctor "watched [him] endure 'pain and suffering [and] loss of eyesight,' instead of discontinuing the [prescribed treatment] and performing additional tests to arrive at a more conclusive diagnosis"); *Candelaria v.*

---

[6] According to the Second Amended Complaint, Smith, after responding to the "Signal 3" alert, "proceeded to state 'I've been doing this too long to be fooled,' 'that's the oldest trick in corrections, he's not going to the clinic, he's going to his cell,' and 'that's the oldest trick in the book.'" (SAC ¶ 52.) While such comments alone do not supply the predicate for a claim of deliberate indifference, *see Gay v. Terrell*, No. 12-CV-2925, 2013 WL 5437045, at *24 (E.D.N.Y. Sept. 27, 2013) (finding a prison official's allegedly unprofessional comments did "not constitute deliberate indifference to medical needs in violation of the Eighth Amendment or any other constitutional violation"); *Gumbs v. Dynan*, No. 11-CV-857, 2012 WL 3705009, at *15 (E.D.N.Y. Aug. 26, 2012) (holding that a prison official's remark, "while less than courteous in tone," did not constitute deliberate indifference to the inmate's medical needs), the complete denial of medical care after Decedent's collapse, perhaps motivated by Smith's apparent skepticism of Decedent's condition, does.

*Erickson*, No. 01-CV-8594, 2005 WL 1529566, at *6 (S.D.N.Y. June 28, 2005) (holding that the plaintiff satisfied the subjective prong by alleging that the defendants were aware that a misdiagnosis may have occurred but failed to take additional diagnostic measures); *cf. Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000) ("Consciously disregarding an inmate's legitimate medical needs is not 'mere medical malpractice.'" (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996))).  It was not until approximately 5:12 a.m., seven minutes after the second "Signal 3" alert in response to Decedent's collapse, that medical personnel took steps to provide any care, but given Decedent's demise soon thereafter, those steps were too late.  (*See* SAC ¶ 58 ("[A]t approximately 5:12 a.m., 911 was finally called . . . .").)  In alleging that Boggi, Smith, and Jordan denied Decedent medical treatment between 4:25 a.m. and 5:00 a.m. in the face of his serious medical condition, Plaintiff has plausibly pled that these three Defendants acted with a sufficiently culpable state of mind for liability under § 1983.

By contrast, the Second Amended Complaint reveals that Ulloa was neither present at WCJ during this time period nor updated about Decedent's status until approximately 5:09 a.m. (SAC ¶¶ 45, 57.)  Plaintiff presents no factual allegations suggesting that Ulloa knew, or had any reason to know, prior to the call from Smith that he had misdiagnosed Decedent more than two hours earlier and that Decedent's condition had deteriorated over the course of the morning. There is thus no basis from which to infer deliberate indifference on the part of Ulloa.

In light of the foregoing analyses, the Court finds the Second Amended Complaint states a viable claim of deliberate indifference against Boggi, Smith, and Jordan.  Ulloa, however, is entitled to dismissal as to this cause of action.

b. Castro

According to the Second Amended Complaint, Castro "knew of and disregarded a substantial risk of serious harm to [Decedent's] health and safety despite being informed that he was suffering from a heart attack." (SAC ¶ 80.) Plaintiff further alleges that his "actions in responding to . . . WCJ from Yonkers . . . instead of having an Empress ambulance on-site . . . show a deliberate indifference to . . . Decedent's serious medical needs." (*Id.* ¶ 81.) However, these two bare assertions are insufficient to state a claim for deliberate indifference against Castro.

It is well established that "[c]onclusory allegations that medical staff defendants were aware of a [prisoner's] medical needs and failed to provide adequate care are generally insufficient to state an Eighth Amendment claim of inadequate medical care." *Flemming v. Smith*, No. 11-CV-804, 2014 WL 3698004, at *6 (N.D.N.Y. July 24, 2014); *see also Gumbs*, 2012 WL 3705009, at *12 ("[C]onclusory allegations that defendants were aware of [a] plaintiff's medical needs . . . but failed to respond are generally not sufficient proof of [the] defendants' deliberate indifference and cannot survive a Rule 12(b)(6) motion to dismiss."); *Adekoya v. Holder*, 751 F. Supp. 2d 688, 697 (S.D.N.Y. 2010) (finding conclusory allegations that the defendants were aware of the plaintiff's medical needs and failed to provide adequate care insufficient to defeat a motion to dismiss); *Evans v. Albany Cty. Corr. Facility*, No. 05-CV-1400, 2009 WL 1401645, at *9 (N.D.N.Y. May 14, 2009) (noting that "a showing of deliberate indifference requires more than just vague and conclusory allegations" (internal quotation marks omitted)). Yet, the Second Amended Complaint is entirely devoid of factual support for the above-mentioned conclusions that Castro's conduct and state of mind constituted deliberate indifference. (*See* SAC ¶¶ 80–81.) Plaintiff at no point alleges that Castro, as an EMS

responder, engaged in any unnecessary or undue delay in responding to the call from WCJ, nor does she allege that Castro rendered any sort of improper treatment once he reached Decedent. There is also no allegation that Castro had any authority with which to direct the dispatching of EMS responders to various destinations or anything to do with the placement of Empress ambulances, that Castro was a "policymaker" at Empress, or that Castro had actual or even constructive knowledge as to the availability of Empress resources and/or personnel stationed closer to WCJ than from where he responded.  (*See generally id.* ¶¶ 58–59, 61–62.)

In her opposition papers, Plaintiff asserts that "the subjective test was met several times over as Castro was well aware of the excessive risk to . . . Decedent's health on the morning of January 29."  (Pl.'s Opp'n to Empress Defs.' Mot. to Dismiss ("Pl.'s Opp'n to Empress Defs.") 12 (Dkt. No. 91).)  This, however, entirely disregards the remainder of that second prong, which requires that an official not only know of an excessive risk *but also disregard* that risk.  *See Gladden*, 2013 WL 4647193, at *2.  The Second Amended Complaint is devoid of plausible allegations that Castro knowingly and recklessly disregarded any risk to Decedent's health, even as he allegedly knew Decedent was suffering a heart attack.  (*See* SAC ¶ 80.)  Indeed, Plaintiff's only support for the issue of mental culpability is her conclusion that "the SAC properly alleges that Castro knew of and recklessly disregarded a substantial risk of serious harm to [Decedent's] health and safety," (Pl.'s Opp'n to Empress Defs. 11), which merely cites to a bare assertion from the Second Amended Complaint, (*see* SAC ¶ 78).  This regurgitation of conclusory allegations is insufficient to state a claim.  *See Morales*, 46 F. Supp. 3d at 251 (holding that the "[p]laintiff's conclusory claims in opposition do not demonstrate the requisite state of mind for deliberate indifference"); *cf. Hidalgo v. Kikendall*, No. 08-CV-7536, 2009 WL 2176334, at *4 (S.D.N.Y. July 22, 2009) (granting motion to dismiss where a defendant's "name only appears

twice in the complaint, in conclusory statements that [the defendant] displayed deliberate indifference to [the plaintiff's] medical needs"); *Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999) ("[W]here the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." (internal quotation marks omitted), *aff'd sub nom*. *Dove v. O'Hare*, 26 F. 3d 354 (2d Cir. 2000).

The Court, therefore, dismisses the deliberate indifference cause of action as to Castro.

C. *Monell* Claims

According to the Second Amended Complaint, "the policies, practices and customs of . . . Westchester, CCS, NYCCS, and Empress . . . were inadequate in that there was a deliberate indifference to the[] serious medical needs" of "WCJ inmates and detainees." (SAC ¶ 73.)  Yet, for the reasons set forth below, this cause of action brought under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) fails to state a claim upon which relief can be granted.

1. Applicable Law

A municipal defendant "cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691 (italics omitted); *see also Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (reaffirming that "a municipality cannot be held liable on a respondeat superior basis for the tort of its employee" (italics omitted)).  Rather, for a plaintiff to prevail on a § 1983 claim against a municipal employer, she must satisfy the requirements set forth in *Monell* and its progeny, which adhere to the well-settled principle that "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Monell*, 436 U.S. at 691; *see also Hunter v. City of*

26

*N.Y.*, 35 F. Supp. 3d 310, 322 (E.D.N.Y. 2014) ("In order to sustain a claim for relief pursuant to

§ 1983 against a municipal defendant, a plaintiff must show the existence of an official policy or

custom that caused injury and a direct causal connection between that policy or custom and the

deprivation of a constitutional right.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the

following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that caused
> the particular deprivation in question; (3) a practice so consistent and widespread
> that, although not expressly authorized, constitutes a custom or usage of which a
> supervising policy-maker must have been aware; or (4) a failure by policymakers
> to provide adequate training or supervision to subordinates to such an extent that it
> amounts to deliberate indifference to the rights of those who come into contact with
> the municipal employees.

*Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted).  In

addition, a plaintiff must establish a causal link between the municipality's policy, custom, or

practice and the alleged constitutional injury.  *See Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d

Cir. 2008) (holding that "a plaintiff must demonstrate that, through its deliberate conduct, the

municipality was the moving force behind the alleged injury" (internal quotation marks

omitted)); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *12 (S.D.N.Y.

Mar. 26, 2015) ("[T]here must be a direct causal link between a municipal policy or custom and

the alleged constitutional deprivation" (internal quotation marks omitted)); *Johnson v. City of

N.Y.*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that "a plaintiff

must establish a causal connection—an affirmative link—between the [municipal] policy and the

deprivation of his [or her] constitutional rights" (internal quotation marks omitted)).

 "Normally, a custom or policy cannot be shown by pointing to a single instance of

unconstitutional conduct by a mere employee of the municipality."  *Tieman*, 2015 WL 1379652,

at *12 (alterations and internal quotation marks omitted); *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy . . . [that] can be attributed to a municipal policymaker."); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").  There are at least two circumstances that courts have expressly identified as constituting a municipal policy:  "where there is an officially promulgated policy as that term is generally understood," and "where a single act is taken by a municipal employee who, as a matter of [s]tate law, has final policymaking authority in the area in which the action was taken." *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008) (footnote omitted).  "A municipal 'custom,' on the other hand, need not receive formal approval by the appropriate decisionmaker," *id.*, but nonetheless "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law," *Kucharczyk v. Westchester Cty.*, 95 F. Supp. 3d 529, 539 (S.D.N.Y. 2015) (internal quotation marks omitted); *see also Tieman*, 2015 WL 1379652, at *16 ("To prevail on this theory of municipal liability, . . . a plaintiff must prove that the custom at issue is permanent and well-settled.").

    2.  <u>Analysis</u>

       The Second Amended Complaint contends that "[t]he actions, omissions, and decisions made by Defendants . . . regarding the provision of comprehensive health care to WCJ inmates and detainees constitute their policies, practices[,] and customs."  (SAC ¶ 69.)  Notwithstanding

this broad assertion, Plaintiff's allegations fail to plausibly allege a *Monell* claim against

Defendants.[7]

     a.  <u>Westchester, CCS, and NYCCS</u>

     The Second Amended Complaint alleges three theories of liability that seek to

demonstrate a "policy and custom" of Westchester, CCS, and NYCCS for purposes of *Monell*:

(i) a formal policy of understaffing; (ii) a "practice of dispatching ambulances" from Yonkers,

rather than from an on-site facility; and (iii) a pattern of providing inadequate health care to WCJ

inmates and detainees.  (SAC ¶¶ 71–72, 74.)[8]

---

     [7] For the purposes of resolving these Motions, the Court assumes CCS, NYCCS, and Empress to be a state actors such that *Monell* would apply to these private entities providing medical care to state inmates.  Various courts in the Second Circuit have adopted this approach, *see Thomas v. Westchester Cty.*, No. 12-CV-6718, 2013 WL 3357171, at *6 n.13 (S.D.N.Y. July 3, 2013) ("assum[ing] without deciding for the purposes of this [m]otion that *Monell* would apply to private entities providing care to state inmates, such as CCS or NYCCS"); *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 432–33 (S.D.N.Y. 2012) (accepting the plaintiff's argument that a private entity acted under color of state law by virtue of its agreement to administer medical services to inmates at WCJ), and Defendants do not argue otherwise.

     [8] Westchester Defendants argue that CCS is not a proper party to this Action as a mere guarantor of NYCCS's performance of its obligations under the Westchester-NYCCS Contract. (*See* Westchester Defs.' Mem. of Law in Supp. of Mot. ("Westchester Defs.' Mem.") 6 (Dkt. No. 65); Westchester Defs.' Reply Mem. of Law in Supp. of Mot. 1–2 (Dkt. No. 92).)  The Second Amended Complaint, however, alleges that "NYCCS was at all times a corporate affiliate of CCS created solely to be responsible for the provision of medical care and treatment to WCJ inmates and detainees . . . ."  (SAC ¶ 7.)  Accepting this allegation as true, the Court finds the alleged facts, though sparse, plausibly suggest that CCS, as the parent corporation, "exercised complete dominion and control over the subsidiary," NYCCS, so as to hold the former liable for the torts of the latter.  *Potash v. Port Auth. of N.Y. & N.J.*, 719 N.Y.S.2d 290, 291 (App. Div. 2001); *cf. Lipton v. Unumprovident Corp.*, 783 N.Y.S.2d 601, 603 (App. Div. 2004) ("Since the plaintiff has alleged no facts indicating that [the parent] exercised such dominion and control over [the subsidiary], there is no basis upon which to predicate liability against [the parent].").  Moreover, courts in this district have addressed similar cases brought against both CCS and NYCCS.  *See, e.g.*, *Alvarado v. Westchester Cty.*, 22 F. Supp. 3d 208, 217 (S.D.N.Y. 2014) (finding "[the] plaintiffs plausibly allege" that CCS and NYCCS were deliberately indifferent to inmates' serious medical needs).

As to the first, the Second Amended Complaint alleges a formal policy of Westchester, CCS, and NYCCS "to not have a physician present at . . . WCJ at all times . . . ." (*Id.* ¶ 72.) Plaintiff specifically complains that the Westchester-NYCCS Contract required "only two physicians [be] provided to WCJ inmates and detainees for 40[-]hour shifts." (*Id.* ¶ 33.)[9] Yet in doing so, Plaintiff provides no constitutional benchmark against which to measure the staffing levels under that contractual agreement. The Court is thus left to rely on the general consensus that an allegation of understaffing, without more, does not amount to a constitutional violation. *See, e.g.*, *McDowell v. Brown*, 392 F.3d 1283, 1291 (11th Cir. 2004) (affirming that a plaintiff "cannot rely on a generalized policy of understaffing" to sustain a § 1983 claim); *Free v. Granger*, 887 F.2d 1552, 1556 (11th Cir. 1989) ("It is not sufficient, however, to point to the absence of a medical doctor, or of a round-the-clock nurse, and decry the staffing policy as unconstitutional."). The Second Amended Complaint fails to provide that something more.

Plaintiff presents no allegations that Westchester, NYCCS, and CCS had "actual or constructive notice that the [staffing policy] is substantially certain to result in the violation of

---

[9] Plaintiff further alleges that this staffing requirement fell short of the "medical service staffing levels . . . provided by WCHCC" in a prior contract with Westchester. (SAC ¶ 33.) However, this allegation is blatantly contradicted by the terms of the contracts themselves, which contain identical staffing requirements and do not require a physician to be on-site at all times. (*Compare* Decl. of John M. Murtagh, Esq. in Supp. of Westchester Defs.' Mot. to Dismiss ("Murtagh Decl.") Ex. B ("Westchester-NYCCS Contract") Schedule A, 9–10 (Dkt. No. 64) ("This minimum level of staffing requires that an R.N. be on-site 24 hours per day, 7 days per week, 365 days per year," though "the minimum level of staffing may be met by substitution of advanced level practitioners in lieu of R.N."), *with id.* Ex. C ("Westchester-WCHCC Contract") Schedule A, 9–10 (same).) The Court may properly consider these documents as incorporated in the Second Amended Complaint by reference, *see Leonard*, 199 F.3d at 107, and "need not accept as true an allegation that is contradicted by documents on which the complaint relies," *Williams v. Citibank, N.A.*, 565 F. Supp. 2d 523, 527 (S.D.N.Y. 2008) (internal quotation marks omitted); *see also Rapoport v. Asia Elec. Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If [incorporated] documents contradict the allegations of the . . . complaint, the documents control and [a] [c]ourt need not accept as true the allegations in the . . . complaint." (citation omitted)).

[inmates'] constitutional rights." *Alvarado*, 22 F. Supp. 3d at 218 (internal quotation marks omitted). Indeed, there is no allegation of a constitutional deprivation or of a resulting injury to accompany Plaintiff's complaint that Ulloa "was not present at . . . WCJ" during the early morning hours of January 29. (SAC ¶ 45.) Just as Decedent "is not entitled to the treatment of his choice, it follows that he is not entitled to receive treatment from a person of his choice." *Scarbrough v. Thompson*, No. 10-CV-901, 2012 WL 7761439, at *12 (N.D.N.Y. Dec. 12, 2012), *adopted by* 2013 WL 1100680 (N.D.N.Y. Mar. 15, 2013). Moreover, the Second Amended Complaint does not demonstrate a "direct causal connection" between the constitutional deprivation suffered by Decedent and this purported policy of understaffing. *See Hunter*, 35 F. Supp. 3d at 322. Apart from the conclusion that the "endorsed" practice "to have no doctor on staff on the morning of January 29 . . . caused the constitutional deprivations that were responsible for . . . [D]ecedent's death," (Pl.'s Opp'n to Westchester Defs. 22), Plaintiff offers no factual allegations to establish that requisite link.

Furthermore, Plaintiff fails to allege that the supposed understaffing at WCJ caused violations of any other inmates' constitutional rights. *See Clouthier v. Cty. of Contra Costa*, 591 F.3d 1232, 1253 (9th Cir. 2010) (rejecting the plaintiff's claim where "there was no evidence that this alleged understaffing problem led to repeated violations of inmates' constitutional rights" (citing *City of Canton v. Harris*, 489 U.S. 378, 398 (1989) (O'Connor, J., concurring in part and dissenting in part))). The Second Amended Complaint points to no other occasion when Westchester Defendants' staffing policy "contributed to or exacerbated an inmate's medical condition." *McDowell*, 392 F.3d at 1290−91 ("While [the plaintiff's] case is tragic, he cannot point to another occasion when the [j]ail's understaffing, and resulting inability to transport, contributed to or exacerbated an inmate's medical condition."). "Simply put, this isolated

incident, however unfortunate, does not demonstrate evidence of [Westchester Defendants']
'persistent' or 'widespread' policy of understaffing the [j]ail so as to delay the transfer of
inmates." *Id.* Even presuming that "the lack of physician access for WCJ inmates and
detainees" deprived Decedent of his constitutional rights on January 29, 2013, (SAC ¶ 74), "[a]
*Monell* claim cannot go forward based on conclusory claims regarding a single incident without
more evidence that connects this incident to a municipal policy or practice," *Pittman v. City of
N.Y.*, No. 14-CV-4140, 2014 WL 7399308, at *7 (E.D.N.Y. Dec. 30, 2014); *see also Batista v.
Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an
official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against
the [c]ity."); *Gordon v. City of N.Y.*, No. 10-CV-5148, 2012 WL 1068023, at *4 (E.D.N.Y. Mar.
29, 2012) (dismissing a *Monell* claim where the plaintiff's "allegation is unsupported by
anything other than the facts of what occurred in his particular case"). This first theory of
liability thus cannot sustain a *Monell* claim against Westchester, CCS, and NYCCS.

The Second Amended Complaint additionally alleges "a policy of said Defendants to
refrain from transporting inmates with serious medical needs to . . . WMC in a timely fashion."
(SAC ¶ 72.) Specifically, Plaintiff complains that, pursuant to "the agreement
between . . . Westchester, CCS, NYCCS, and Empress," (*id.* ¶ 34), "the placement of the closest
ambulance available to WCJ inmates and detainees was [11] miles away in Yonkers," (*id.*). Yet,
in noting that Delgrosso called 911 the morning of January 29, 2013, (*see id.* ¶ 58), the Second
Amended Complaint indicates the Empress ambulance that arrived at WCJ that morning had
been dispatched by 911, *not* pursuant to any such agreement regarding inmate transport, (*cf.*
Westchester-NYCCS Contract, at Schedule A, 15 (contracting for the "transporting of inmates
for *non-emergency* health services" (emphasis added))). It follows that any alleged harm caused

to Decedent by the ambulance's response time cannot be linked to a contractual provision evidencing any municipal policy on the part of Westchester, CCS, and NYCCS.

Moreover, both the Westchester-NYCCS Contract and the NYCCS-Empress Contract are absolutely silent as to the stationing of ambulances. (*See generally* Westchester-NYCCS Contract; Murtagh Decl. Ex. D ("NYCCS-Empress Contract").)[10] Regarding patient transport, the former merely provides that NYCCS will arrange and pay for the "transporting of inmates for *non-emergency* health services." (Westchester-NYCCS Contract, at Schedule A, 15 (emphasis added).) The NYCCS-Empress Contract "to provide off[-]site ambulatory services to [i]nmates" at WCJ similarly includes no mention of the placement of ambulances to be dispatched to fulfill this contractual obligation. (NYCCS-Empress Contract at unnumbered 1.) Clearly, neither gives rise to any inference of a policy or practice on the stationing of ambulances or the response time of an ambulance dispatched in emergency situations.[11] The Second Amended Complaint, therefore, fails to sufficiently attribute to Westchester, CCS, and NYCCS a "practice of dispatching ambulances" from Yonkers in emergency situations, (SAC ¶ 71), let alone to adequately allege that such a policy would be unconstitutional.[12]

---

[10] As with the Westchester-NYCCS Contract and the Westchester-WCHCC Contract, the Second Amended Complaint incorporates the Empress-NYCCS Contract by reference such that the Court may properly consider it in resolving the instant Motions. *See Leonard*, 199 F.3d at 107.

[11] Plaintiff claims that "[t]he previous arrangement with WCHCC provided for on-site ambulance services and adequate response times." (SAC ¶ 34.) This allegation, however, is contradicted by the virtually identical terms contained in the Westchester-WCHCC and Westchester-NYCCS Contracts, whereby neither document makes mention of the stationing of ambulances. (*Compare* Westchester-NYCCS Contract, at Schedule A, 15, *with* Westchester-WCHCC Contract, at Schedule A, 15.) Once again, the documents control. *See Williams*, 565 F. Supp. 2d at 527 ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies." (internal quotation marks omitted)).

As a final theory of liability, Plaintiff asserts that "the policies, practices, and customs of Defendants . . . led to the refusal to provide adequate medical care to WCJ inmates and detainees; to the delay of proper care to WCJ inmates and detainees; to the negligent training of its employees; to the lack of physician access for WCJ inmates and detainees; and to the misdiagnosis and indifference of [Decedent's] serious medical needs . . . ."  (SAC ¶ 74.) However, "[a]llegations that a defendant acted pursuant to a policy or custom[,] without any facts suggesting the policy's existence, are plainly insufficient."  *Moore v. City of N.Y.*, No. 08-CV-8879, 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010) (internal quotation marks omitted). Plaintiff offers no such facts, and her bare assertions, therefore, will not sustain a *Monell* claim. *See Maynard v. City of N.Y.*, No. 13-CV-3412, 2013 WL 6667681, at *4 (S.D.N.Y. Dec. 17, 2013) ("Conclusory allegations that there was such a policy or custom, without identifying or alleging supporting facts, is insufficient to state a claim."); *5 Borough Pawn, LLC v. City of N.Y.*, 640 F. Supp. 2d 268, 299 (S.D.N.Y. 2009) (concluding that the "plaintiffs' pleading . . . does not unlock the doors of discovery because their assertion that the [c]ity has an unconstitutional

---

[12] In seeking to defend this claim, Plaintiff points to Westchester's failed attempt "to reach a deal with" another company for closer ambulance stationing and CCS's failed negotiations with Empress "to stage an ambulance closer to the prison," (Pl.'s Opp'n to Westchester Defs. 21; *see also* Decl. of Jared R. Rice, Esq. in Opp'n to Westchester Defs.' Mot. to Dismiss ("Rice Decl.") Ex. C ("Committee Meeting Minutes") 2 (Dkt. No. 82)).  Though "a complaint may not be amended by the briefs in opposition to a motion to dismiss," *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 390 n.19 (S.D.N.Y. 2013); *see also Kiryas Joel All. v. Vill. of Kiryas Joel*, No. 11-CV-3982, 2011 WL 5995075, at *10 n.9 (S.D.N.Y. Nov. 29, 2011) ("[T]he plaintiffs cannot use their opposition to the motion to dismiss to raise new claims or arguments, and thus the [c]ourt does not address the new arguments made in the plaintiffs' memorandum."), *aff'd*, 495 F. App'x 183 (2d Cir. 2012), the Court nonetheless notes that these allegations alone do not amount to a constitutional deprivation of care.  Even if such an alternative arrangement would be desirable, it does not suggest actual or constructive knowledge notice of an obvious "need for corrective action."  *Williams v. City of N.Y.*, 690 F. Supp. 2d 338, 344 (S.D.N.Y. 2010).

policy is based on nothing more than their unsupported supposition" (alterations and internal quotation marks omitted)).

To the extent Plaintiff looks to the Findings Letter to support this claim, such reliance is wholly misguided. The CRIPA investigation examined medical care provided at WCJ in 2008, (*see generally* U.S. Dep't of Justice, "CRIPA Investigation of the Westchester County Jail, Valhalla, New York" (Nov. 19, 2009), http://www.justice.gov/sites/default/files/crt/legacy/ 2010/12/15/Westchester_findlet_11-19-09.pdf), well before Westchester entered into a contract with NYCCS, (*see* SAC ¶ 18).[13] Given that investigation involved a different health care provider, there is no basis to attribute the resulting report to CCS's and NYCCS's performance nearly four years later under a subsequent contract. *See Thomas*, 2013 WL 3357171, at *6 (rejecting the plaintiff's reliance on the Findings Letter where the allegations post-dated its publication and where neither CCS nor NYCCS were mentioned therein). Nor can CCS and NYCCS be charged with awareness of any unconstitutional acts by *their* employees, since the Findings Letter faults conduct that occurred under the watch of a different provider. While Westchester, on the other hand, was certainly aware of the results of that investigation, this is not a case "of municipal inaction in the face of government-documented misconduct through investigations," *Hunter*, 35 F. Supp. 3d at 323–24, considering that Westchester subsequently arranged for a new agreement concerning the provision of medical care at WCJ.

In failing to present sufficient facts of any policy or custom, the Second Amended Complaint cannot hold Westchester, CCS, and NYCCS liable.

---

[13] The Second Amended Complaint not only references but also explicitly incorporates the Findings Letter, (SAC ¶ 22 (stating that "the Findings Letter . . . is incorporated by reference herein"); *see also id.* ¶¶ 18–21), which the Court thus considers in resolving the instant Motions, *see Leonard*, 199 F.3d at 107.

b. Empress

As to Empress, Plaintiff alleges that, pursuant to its contract with NYCCS, "it was the official policy of . . . Empress to station its ambulance responsible for WCJ inmates and detainees in Yonkers, . . . [11] miles away."  (SAC ¶ 70.)  The Court, however, has already noted that the terms of the Empress-NYCCS Contract make no provision as to the stationing of ambulances, (*see* NYCCS-Empress Contract at unnumbered 1), and thus cannot give rise to formal policy for purposes of *Monell* liability.  Moreover, while Plaintiff asserts that the "said practice of dispatching ambulances was so persistent and widespread that it constituted an official policy or custom," (SAC ¶ 71), this general conclusion does not suffice to satisfy the requirements of *Monell*, *see Maynard*, 2013 WL 6667681, at *4.  Indeed, the Second Amended Complaint faults "[t]he inadequate average response time provided by Empress through its agreement with Westchester, CCS, and NYCCS," (SAC ¶ 34), but puts forth no allegations of any other unconstitutional incidents in that regard, *see Pittman*, 2014 WL 7399308, at *7.

Even if such a policy did exist, the Second Amended Complaint has not plausibly plead that any charged official acted or failed to act while actually aware of substantial risk that serious harm would result.  *See Nielsen*, 746 F.3d at 63.  Plaintiff complains that "Empress did not dispatch one of its ambulances that was stationed on site at the Valhalla campus within yards of . . . Decedent."  (SAC ¶ 59.)  Even accepting as true the implication that there was an on-site ambulance available to respond to the call from WCJ on January 29, there is no allegation that the dispatch occurred with the requisite mental culpability on the part of an Empress official.  *See Salahuddin*, 467 F.3d at 280.  At most, the facts contained in the Second Amended

36

Complaint suggest a potentially negligent dispatch, which does not amount to a constitutional violation. *See Gladden*, 2013 WL 4647193, at *2.[14]

As the only other evidence to suggest prior knowledge of "[t]he inadequate average response time provided by Empress through its agreement with Westchester, CCS, and NYCCS," (SAC ¶ 34), the Second Amended Complaint points to the findings of the prior CRIPA investigation, (*id.* ¶ 18). Yet, Plaintiff's self-serving conclusion aside, (*see* Pl.'s Opp'n to Empress Defs. 10 ("The SAC also linked those findings of substandard care to Empress . . . .")), this earlier investigation bears absolutely no relation to Empress' provision of ambulatory services under the Empress-NYCCS Contract, (*see generally* CRIPA Investigation of the Westchester County Jail). Plaintiff's allegations relate to conduct that occurred nearly four years after the CRIPA investigation, and there is no indication, either in the Findings Letter or in the Second Amended Complaint, that Empress had any affiliation with WCJ in 2008. *See Thomas*, 2013 WL 3357171, at *6 (finding the plaintiff's reliance on an earlier DOJ investigation insufficient where he failed to "alleg[e] that [the municipal defendant] or any of its policymakers were the subject of or privy to the results of the [i]nvestigation [r]eport"). Moreover, the Findings Letter includes neither any mention of Empress, nor any reference to inadequate EMS response times. *Compare id.* (dismissing *Monell* claim where "the medical care policies found [by DOJ to be] deficient at WCJ . . . are unlike the deprivation of medical care [the] [p]laintiff

---

[14] Assuming, arguendo, a constitutional violation occurred, the Second Amended Complaint fails to adequately allege "a direct causal link." *See Tieman*, 2015 WL 1379652, at *12 (internal quotation marks omitted). Plaintiff's circular reasoning that "[t]he causation . . . is established by the deliberate indifference shown by Empress" does nothing to salvage this claim, (*see* Pl.'s Opp'n to Empress Defs. 9), as the "causal connection" is a prerequisite for municipal liability, *see Johnson*, 2011 WL 666161, at *3. The Court need not consider her subsequent allegation that "Decedent's injuries and death resulted from his not being able to be treated at WMC in a timely fashion," (*see* Pl.'s Opp'n to Empress Defs. 9), which is raised for the first time in her opposition papers, *see Kiryas*, 2011 WL 5995075, at *10 n.9.

alleges here"), *with Kucharczyk*, 95 F. Supp. 3d at 544–45 (finding 2009 DOJ report "sufficient to allege a widespread practice at WCJ of which policymakers were aware," because the plaintiff alleged "that the deficiencies in medical care and the medical grievance process at WCJ affected his ability to receive care in 2012").  Without any allegation that Empress ever received complaints, administrative or otherwise, with respect to its response times, the Second Amended Complaint fails to allege any "actual or constructive notice that the [ambulance stationing] is substantially certain to result in the violation of [inmates'] constitutional rights."  *Canton*, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part).  Once again, Plaintiff cannot satisfy the requirements of *Monell*.

In light of the foregoing analyses, the Court dismisses Plaintiff's § 1983 claims against Westchester, CCS, NYCCS, and Empress.

D.  <u>Supervisory Liability</u>

In addition, Plaintiff alleges that "Ulloa was responsible for supervising and training the medical staff who provided treatment to WCJ inmates and detainees and failed to properly supervise and train the medical staff regarding the reckless and negligent medical treatment provided to . . . Decedent on January 29, 2013."  (SAC ¶ 83.)  This allegation, however, fails to state a claim for supervisory liability.

"To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations."  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam).  Personal involvement may be established by demonstrating

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of

subordinates who committed a violation, or (5) failure to act on information that unconstitutional acts were occurring.

*Elek v. Inc. Vill of Monroe*, 815 F. Supp. 2d 801, 806 (S.D.N.Y. 2011) (internal quotation marks omitted).

The facts alleged here fall short of that threshold.  While Plaintiff asserts that "the inadequate supervision provided by . . . Ulloa" violated Decedent's constitutional rights, (SAC ¶ 84), this conclusory allegation is insufficient to state a claim for § 1983 supervisor liability, *see Paulin v. Figlia*, 916 F. Supp. 2d 524, 536 (S.D.N.Y. 2013) (finding that the plaintiff's "conclusory statements[,] without facts to support them, are insufficient to attach supervisory liability" (alteration omitted)); *cf. Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 191 (2d Cir. 2010) ("Conclusory allegations that the defendant violated the standards of law do not satisfy the need for plausible factual allegations."), *aff'd*, 133 S. Ct. 1659 (2013).  All Plaintiff offers by way of opposition to Westchester Defendants' Motion is disapproval of Ulloa's diagnostic and treatment decisions.  Indeed, in complaining that Ulloa "lazily misdiagnos[ed] his condition" and "fail[ed] to instruct that . . . [D]ecedent immediately receive life[-]saving treatment," (Pl's Opp'n to Westchester Defs. 25), Plaintiff merely restates her disagreement with the medical care Decedent received.  As discussed in depth above, such assertions of negligent diagnosis or treatment do not state a constitutional claim.  *See Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Baptiste*, 2010 WL 3185748, at *6 (dismissing supervisory liability claim on the basis that "the differential diagnosis did not constitute constitutionally inadequate medical care").  These allegations, therefore, cannot establish Ulloa's "actual direct participation" in any violation of Decedent's constitutional rights.  *See Elek*, 815 F. Supp. 2d at 806.  Nor can Plaintiff's contention that

"Ulloa participated in the deprivation of . . . Decedent's constitutional rights by declining to share with his subordinates information surrounding [Decedent's] prior chest X-ray."  (Pl.'s Opp'n to Westchester Defs. 25.)  This claim not only lacks support in the Second Amended Complaint but, in fact, is directly contradicted by allegations contained therein.  Plaintiff expressly notes that during their telephone conversation Boggi and Ulloa discussed "that [Decedent] had the same chest discomfort a couple of nights before."  (SAC ¶ 45.)

Along similar lines, Plaintiff next faults Ulloa for "fail[ing] to remedy these wrongs by not following up with his initial reckless diagnosis."  (Pl's Opp'n to Westchester Defs. 25.)  Yet, notwithstanding Plaintiff's bare insistence as to "[Ulloa's] knowledge that . . . Decedent exhibited deadly chest pain symptoms," (*id.*), the Court has already determined that Ulloa was not, in fact, reckless.  The Second Amended Complaint plausibly pleads deliberate indifference on the part of Boggi, Jordan, and Smith after the first "Signal 3" alert but provides no factual allegations suggesting Ulloa was aware of the misdiagnosis and the substantial risk to Decedent's health.  *See Nielsen*, 746 F.3d at 63.  Indeed, Ulloa was only notified about the deterioration in Decedent's condition at around the same time that the 911 call was made.  (*See* SAC ¶ 57 (noting that at approximately 5:09 a.m., Smith called Ulloa, who was not present at WCJ); *id.* ¶ 58 (noting that at approximately 5:12 a.m., Smith instructed Delgrosso to call 911).)  Since the facts do not plausibly suggest that Ulloa had prior knowledge of a previously unreported heart condition, or that any unconstitutional conduct by a particular subordinate was brought to Ulloa's attention before Decedent collapsed, supervisory liability cannot attach here for any "failure to remedy a wrong after being informed."  *See Elek*, 815 F. Supp. 2d at 806; *cf. Stamile v. Cty. of Nassau*, No. 10-CV-2632, 2014 WL 1236885, at *5 (E.D.N.Y. Mar. 25, 2014) (finding the "[p]laintiffs have not adequately demonstrated supervisory liability" where "[they]

40

have not included any additional factual detail to support their assertions that [the defendant] knew about the constitutional violations"); *Risch v. Hulihan*, No. 09-CV-330, 2010 WL 5463339, at *4 (N.D.N.Y. Dec. 29, 2010) (rejecting supervisory liability claim in part because "there is nothing in the record to suggest that any of these defendants were aware of any alleged conduct that violated [the] plaintiff's constitutional rights").

Even as Plaintiff offers the bare assertion that Ulloa "otherwise failed to act," (Pl.'s Opp'n to Westchester Defs. 25), she outlines his prescribed course of treatment, (*see* SAC ¶¶ 45–46 (noting Ulloa prescribed Decedent "the medications Zantac and Mylanta" after being "advised of the findings of [Boggi's] assessment")), as well as his subordinates' conduct in accordance with his directives, (*see id.* ¶ 47 (indicating "[Decedent] received Zantac and Mylanta"); *id.* ¶ 48 (noting Boggi then "monitored and observed" Decedent)). Thus, not only does the Second Amended Complaint fail to suggest that Ulloa had "information that unconstitutional acts were occurring," but also the allegations contained therein show he did, in fact, act. *See Elek*, 815 F. Supp. 2d at 806.[15]

Plaintiff, therefore, fails to state a claim based on a theory of supervisory liability, and Defendants are entitled to dismissal on this cause of action.

E. State Law Claims

In addition to the federal constitutional claims addressed above, the Second Amended Complaint contains a number of claims arising under New York state law—namely, medical

---

[15] Moreover, there are no facts giving rise to the inference that Ulloa was "grossly negligent" in supervising the activities of Boggi, Smith, and Jordan, given that he prescribed a course of treatment and was otherwise not informed of Decedent's condition until after the second "Signal 3" alert. The Second Amended Complaint is also entirely devoid of allegations that Ulloa had any policymaking authority over medical care for WCJ inmates and detainees.

malpractice, respondeat superior, negligent hiring, supervision, and retention, breach of contract, wrongful death, and punitive damages.  (*See* SAC ¶¶ 85–108.)

Because these causes of action do not present a federal question, *see* 28 U.S.C. § 1331, and because Plaintiff does not allege that Decedent's citizenship is diverse with respect to that of Defendants, *see id.* § 1332; *accord Adler v. Adler*, 862 F. Supp. 70, 72 (S.D.N.Y. 1994) (reaffirming that "the citizenship of a decedent, not the executor, is the only citizenship pertinent for diversity purposes"), the Court may entertain these claims only pursuant to a theory of supplemental jurisdiction, *see* 28 U.S.C. § 1367.

### 1.  Empress Defendants

As discussed in detail above, this Court has already dismissed the federal causes of action against Empress and Castro.  Where a district court "has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction" over any remaining claims.  28 U.S.C. § 1367(c)(3); *accord Matican v. City of N.Y.*, 524 F.3d 151, 154–55 (2d Cir. 2008) ("[I]f [a plaintiff] has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over the pendent state-law claims.").  "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity, in deciding whether to exercise jurisdiction."  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citations and internal quotation marks omitted).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

The Court finds that nothing distinguishes this Action from "the usual case."  For one, Plaintiff's federal claims against Empress Defendants are all dismissed prior to trial.  *See Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 575 (S.D.N.Y. 2012) (declining to exercise supplemental jurisdiction where "th[e] case remains in its initial stages, and the [p]arties have not yet proceeded to discovery"); *Middleton v. United States*, No. 10-CV-6057, 2012 WL 394559, at *1 (E.D.N.Y. Feb. 7, 2012) (declining to exercise supplemental jurisdiction because no federal claims survived a motion to dismiss).  Moreover, none of the factors that the Supreme Court enunciated in *Cohill*—"judicial economy, convenience, fairness, [or] comity"—militates against such dismissal, 484 U.S. at 350 n.7, considering that it is not alleged that Empress Defendants had any role in the particular events that gave rise to the surviving § 1983 claims against Boggi, Smith, and Jordan, *see Germano v. Dzurenda*, No. 09-CV-1316, 2011 WL 1214435 at *20 (D. Conn. Mar. 28, 2011) (dismissing without prejudice state-law claims against 12 defendants once the federal claims against those same 12 defendants were dismissed, even though federal claims remained viable against others in the case); *accord Billizone v. Jefferson Par. Corr. Ctr.*, No. 14-CV-1263, 2014 WL 7139636, at *5 (E.D. La. Dec. 15, 2014) (declining "to consider any such state law claims against [a particular defendant] in light of the fact that [the] plaintiff's federal claims against her are being dismissed"); *Kis v. Cty. of Schuylkill*, 866 F. Supp. 1462, 1480 (E.D. Pa.1994) (explaining that where all federal claims against some defendants were dismissed, the decision to entertain or dismiss pendent state law claims against those defendants was within the district court's discretion).

Accordingly, Plaintiff's state-law claims against Empress Defendants are dismissed without prejudice to refiling in state court.

2.  <u>Westchester Defendants</u>

By contrast, some of Plaintiff's federal causes of action against Westchester Defendants have survived their Motion.  The abovementioned state-law claims arise out of the same case or controversy—i.e., the medical treatment provided to Decedent on January 29, 2013—and thereby fall within this Court's supplemental jurisdiction pursuant to § 1367(a).  *See Oladokun v. Ryan*, No. 06-CV-2330, 2011 WL 4471882, at *11 (S.D.N.Y. Sept. 27, 2011) (explaining that § 1367 "confers mandatory supplemental jurisdiction over state law claims that 'form part of the same case or controversy' as claims over which the district courts have original jurisdiction"); *Bu ex rel. Bu v. Benenson*, 181 F. Supp. 2d 247, 251 (S.D.N.Y. 2001) ("Essentially, supplemental jurisdiction will be found where the state and federal claims arise from the same basic facts." (italics and internal quotation marks omitted)).

a.  <u>Medical Malpractice</u>

Plaintiff claims that the medical treatment provided to Decedent on January 29 "was given and rendered in an improper, negligent, and careless manner in that Defendants" not only "failed to employ the skill, care, and diligence commonly and ordinarily possessed by, and required of[,] medical care providers in the same locality . . . ."  (SAC ¶ 86.)  As a result, Decedent suffered injuries that include, inter alia, "tremendous conscious pain and suffering; loss of enjoyment of life; emotional upset, shock, and fright; and death."  (*Id.* ¶ 87.)

"Under New York law, the requisite elements of proof in a medical malpractice action are (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage."  *Torres v. City of N.Y.*, 154 F. Supp. 2d 814, 819 (S.D.N.Y. 2001) (citing *Lyons v. McCauley*, 675 N.Y.S.2d 375, 376 (App. Div. 1998)); *see also Gale v. Smith & Nephew, Inc.*, 989 F. Supp. 2d 243, 252 (S.D.N.Y. 2013) ("Under New York

law, the essential elements of a medical malpractice claim are a departure from good and
accepted medical practice and evidence that such departure was a proximate cause of the
plaintiff's injury." (alterations and internal quotation marks omitted)).

In alleging Decedent suffered various injuries as a result of the failure of Ulloa, Boggi,
Smith, and Jordan "to employ reasonable and proper steps, procedures, and practices for the
health, welfare, safety of . . . Decedent," (SAC ¶ 86), the Second Amended Complaint has
adequately pled those elements.  Although Westchester Defendants contend that "Plaintiff has
not alleged in even rudimentary terms a particular alleged departure from accepted medical
practice" so as to place them "on reasonable notice of the basis of this claim," (Westchester
Defs.' Mem. of Law in Supp. of Mot. ("Westchester Defs.' Mem.") 27 (Dkt. No. 65)), the
Second Amended Complaint expressly incorporates the previous paragraphs' allegations, (SAC
¶ 85), which include, inter alia, that "Boggi failed to hook . . . [D]ecedent up to a heart monitor"
or "provide [him] with oxygen," (*id.* ¶ 44), that "Ulloa negligently instructed . . . Boggi to
provide [Decedent] with the medications" to treat indigestion, (*id.* ¶ 46), and that Boggi, Smith,
and Jordan failed to bring Decedent to a medical facility, (*id.* ¶ 53).  Plaintiff has thus adequately
alleged that Westchester Defendants made treating decisions that might be considered deviations
from accepted medical practice.  *See Rennalls v. Alfredo*, No. 12-CV-5300, 2015 WL 5730332,
at *13 (S.D.N.Y. Sept. 30, 2015) (finding the plaintiff "adequately alleged that [the defendant]
deviated or departed from accepted practices" through "allegations that his requests for further
testing were denied and that he suffers continuing pain and difficulty hearing as a result").  The
Second Amended Complaint further alleges that the failure to properly treat Decedent's heart
condition resulted in harm to Decedent—namely, his death.  (SAC ¶ 87.)  In this way, Plaintiff
has nudged her claim of medical malpractice over the line from possible to plausible, *see*

*Twombly*, 550 U.S. at 570, and Westchester Defendants are not entitled to dismissal of this cause of action.

### b. Respondeat Superior

As the Fifth Cause of Action, Plaintiff alleges that Westchester, CCS, and NYCCS "are vicariously liable for the tortious acts committed by [their] employees within the scope of the employment relationship and are vicariously liable for the injuries sustained by . . . Decedent." (SAC ¶ 92.)  In this regard, Plaintiff also alleges that Ulloa, Boggi, Smith, and Jordan were employees of Westchester, CCS, and NYCCS "at all times between August 9, 2011 and January 29, 2013."  (*Id.* ¶ 90.)

"Unlike cases brought under § 1983, municipalities may be liable for the common law torts . . . committed by their employees under the doctrine of respondeat superior." *L.B. v. Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002); *see also Raysor v. Port Auth.*, 768 F.2d 34, 38 (2d Cir. 1985) (dismissing § 1983 claims under *Monell* but permitting state-law claims based on respondeat superior to proceed); *Bektic-Marrero*, 850 F. Supp. 2d at 434 (declining "to dismiss the pendent state law claims against [the employer-defendant] that depend on the doctrine of respondeat superior," even where the plaintiff's § 1983 claims against that defendant were dismissed).  Under this doctrine, an employer can be held "vicariously liable for torts committed by an employee acting within the scope of the employment . . . , so long as the tortious conduct is generally foreseeable and a natural incident of the employment." *RJC Realty Holding Corp. v. Republic Franklin Ins. Co.*, 808 N.E.2d 1263, 1265–66 (N.Y. 2004) (internal quotation marks omitted).

In incorporating the allegations contained in the previous paragraphs of the Second Amended Complaint, (SAC ¶ 89), Plaintiff provides adequate notice of the specific tortious

conduct "to be proven," notwithstanding Westchester Defendants' insistence to the contrary, (*see* Westchester Defs.' Mem. 28 (asserting that "[t]his pleading is not sufficiently particular to give notice . . . of the particular occurrences to be proven" (citing SAC ¶¶ 90–92)).  The singular focus of those allegations makes clear that the same facts giving rise to the deliberate indifference claims also form the basis of Plaintiff's state-law claims for malpractice and wrongful death against Ulloa, Boggi, Smith, and Jordan.  *See Bektic-Marrero*, 850 F. Supp. 2d at 434 (denying motion to dismiss respondeat superior claim where the complaint "allege[d] that [the doctor defendants] were [another defendant's] employees when they took the actions that gave rise to [the decedent's] § 1983 claim," and "[t]hose same actions form the basis of state law claims for malpractice, wrongful death, and infliction of emotional distress against the [d]octor [d][efendants]").  Having alleged the requisite employment status for the relevant time, (*see* SAC ¶ 90), Plaintiff may proceed with this cause of action due to the potential for vicarious liability for the acts or omissions of Ulloa, Boggi, Smith, and Jordan as employees of Westchester, CCS, and NYCCS, *see Reyes v. City of N.Y.*, 992 F. Supp. 2d 290, 299 (S.D.N.Y. 2014) ("The state law claims . . . against the [municipality] may proceed due to the potential for vicarious liability for the actions of the officers as its employees.").

### c.  Negligent Hiring, Supervision, and Retention

According to the Second Amended Complaint, "Westchester negligently hired, supervised, and retained CCS and NYCCS and owed a duty to . . . Decedent to ensure that he received adequate and proper medical care and breached that duty when they negligently hired, supervised, and retained unqualified and careless companies in . . . CCS and NYCCS."  (SAC ¶ 95.)

47

In general, "[w]here an employee is acting within the scope of his or her employment, the employer is liable under the theory of respondeat superior[,] and no claim may proceed against the employer for negligent hiring or retention." *Rossetti v. Bd. of Educ.*, 716 N.Y.S.2d 460, 462 (App. Div. 2000); *see also Velez v. City of N.Y.*, 730 F.3d 128, 137 (2d Cir. 2013) ("If the employee acted within the scope of her employment, the employer and the employee's supervisors may be held liable for the employee's negligence only under a theory of respondeat superior." (italics omitted)).[16]  The rationale for this restriction is that if the employee is found negligent, then the employer must pay the judgment regardless of the reasonableness of the hiring, training, or supervision, whereas if the employee was not negligent, there should be no basis for imposing liability on the employer.  *See Karoon v. N.Y.C. Transit Auth.*, 659 N.Y.S.2d 27, 29 (App. Div. 1997).

The Sixth Cause of Action must fail precisely because the Second Amended Complaint offers no allegations that CCS or NYCCS were acting outside scope of employment during the course of events giving rise to Plaintiff's claim.  *See Zeak v. United States*, No. 11-CV-4253, 2015 WL 246340, at *4 (S.D.N.Y. Jan. 20, 2015) (holding "that [the] [p]laintiff's negligent hiring and supervision claim fails because [she] cannot show that the alleged malpractice occurred outside the scope of the [tortfeasors'] employment"); *Stevens v. Webb*, No. 12-CV-

---

[16] Although a limited exception to this rule exists where the plaintiff "is seeking punitive damages from the employer based on gross negligence in hiring, training, or supervising the employee," *see Mahar v. U.S. Xpress Enters., Inc.*, 688 F. Supp. 2d 95, 110 (N.D.N.Y.), the Second Amended Complaint is devoid of any allegation of gross negligence on the part of Westchester, *see Woods v. Town of Cheektowaga*, No. 11-CV-343, 2012 WL 5288767, *8 (W.D.N.Y. 2012) ("[B]ecause [the] [p]laintiffs have not alleged gross negligence on the part of the [t]own, the exception to this general rule does not apply."), and, in any event, Westchester cannot be liable for punitive damages, s*ee Martinez v. Cty. of Suffolk*, 999 F. Supp. 2d 424, 433 (E.D.N.Y. 2014) (explaining that the gross negligence exception is inapplicable against a municipality because "the State and its political subdivisions . . . are not subject to punitive damages" (internal quotation marks omitted)).

48

2909, 2014 WL 1154246, at *12 (E.D.N.Y. Mar. 21, 2014) ("Because all of these allegations relate to [the employees'] ability to perform a duty within the scope of their employment . . . , [the] plaintiff has not stated a claim for negligent supervision and training.").  Indeed, the gravamen of this claim centers exclusively on "the services of CCS and NYCCS, both as independent contractors," hired and retained by Westchester.  (SAC ¶ 97; *see also id.* ¶ 96 (alleging CCS's and NYCCS's prior failings in the provision of "comprehensive health services").)  The Court, therefore, dismisses Plaintiff's claim for negligent hiring, supervision, and retention.

### d.  Breach of Contract

As the Seventh Cause of Action, Plaintiff alleges that CCS and NYCCS are liable to Decedent for breaching the NYCCS-Westchester Contract under which CCS and NYCCS were to provide medical treatment to inmates at WCJ.  (*See* SAC ¶¶ 100–04.)  Decedent was not a signatory to this agreement.  (*Id.* ¶ 101.)  Rather, Plaintiff argues that Decedent is a third-party beneficiary to the NYCCS-Westchester Contract such that she has standing to sue on his behalf for NYCCS and CCS's alleged breach of this agreement "to provide comprehensive health care to WCJ inmates and detainees."  (*Id.* (alleging that the NYCCS-Westchester Contract "was made for the benefit of . . . Decedent"); *cf.* Westchester Defs.' Mem. 29.)

"A third party seeking to recover on a contract must establish that a binding contract exists between other parties; that this contract was intended for his benefit; and that the benefit to him was direct rather than incidental."  *Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Tr. Co.*, 689 N.Y.S.2d 455, 460 (App. Div. 1999); *see also Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248 (2d Cir. 2002) (same).  A benefit is intended rather than incidental if it is "sufficiently immediate . . . to indicate the assumption by the contracting parties of a duty to

compensate [the third party] if the benefit is lost." *State of Cali. Pub. Emps.' Ret. Sys. v. Shearman & Sterling*, 741 N.E.2d 101, 104 (N.Y. 2000).  "Where performance is to be rendered directly to a third party under the terms of an agreement, that party must be considered an intended beneficiary." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991) (internal quotation marks omitted); *cf. Internationale Nederlanden,* 689 N.Y.S.2d at 460 (noting that a court must "look at the overall purpose of the transaction" in determining whether a third party has standing to enforce a contract).  It is the burden of that party claiming to be an intended third-party beneficiary to demonstrate his or her right to enforcement.  *See Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 336 (S.D.N.Y. 2005) (citing *Strauss v. Belle Realty Co.*, 469 N.Y.S.2d 948, 950 (App. Div. 1983), *aff'd,* 482 N.E.2d 34 (N.Y. 1985)).

Plaintiff here has met that burden.  As a WCJ inmate, (*see* SAC ¶ 37), Decedent was indeed the intended beneficiary of the NYCCS-Westchester Contract "for the provision of health care services to inmates and detainees at . . . WCJ," (*id.* ¶ 24).  Courts in the Second Circuit have readily reached the same conclusion under similar circumstances.  *See Zikianda v. Cty. of Albany*, No. 12-CV-1194, 2015 WL 5510956, at *37 (N.D.N.Y. Sept. 15, 2015) (finding that, as a prior detainee, "[the] [d]ecedent was clearly an intended beneficiary of this contract, which requires the provision of medical care to detainees"); *Mayo v. Cty. of Albany*, No. 07-CV-823, 2009 WL 935804, at *5 (N.D.N.Y. Apr. 3, 2009) (noting "there is no doubt that [the detainee] was a third party beneficiary" of a contract to provide medical services at a county correctional facility), *aff'd*, 357 F. App'x 339 (2d Cir. 2009); *Murns v. City of N.Y.*, No. 00-CV-9590, 2001 WL 515201, at *5 (S.D.N.Y. May 15, 2001) (finding that "the inmates were the intended beneficiaries of the contract" whereby a medical provider "agreed to provide medical services to the inmates of [c]ity correctional facilities").

Additionally, "to state a breach of contract claim, the pleadings must allege the provisions of the contract upon which the claim is based and the defendant's acts or omissions constituting the breach." *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 457–58 (S.D.N.Y. 2012) (citations and internal quotation marks omitted)).  The Second Amended Complaint satisfies that requirement, expressly alleging "[t]hat CCS and NYCCS breached said contract when they did not provide the required semiannual[] and annual reports" to "allow Westchester to provide adequate oversight of the quality of care and staffing levels providing to WCJ inmates . . . ." (SAC ¶ 102.)

Plaintiff, therefore, has plausibly pled a third-party claim for breach of contract.

e. Wrongful Death

Plaintiff brings a wrongful death cause of action on behalf of Decedent's "surviving next of kin," which includes "at least four children[,] who had a reasonable expectation of support from . . . Decedent and were entitled to his comfort and the enjoyment of his society."  (SAC ¶ 107.)

Under New York law. the elements of a cause of action for wrongful death are:  "(1) the death of a human being, (2) the wrongful act, neglect or default of the defendant by which the decedent's death was caused, (3) the survival of distributees who suffered pecuniary loss by reason of the death of decedent, and (4) the appointment of a personal representative of the decedent." *Quinn v. United States*, 946 F. Supp. 2d 267, 277 (N.D.N.Y. 2013) (quoting *Chong v. N.Y.C. Transit Auth.*, 441 N.Y.S.2d 24, 25–26 (App. Div. 1981)).  With respect to the third element, "[a] distributee is a person entitled to take or share in the property of a decedent under the statutes governing descent and distribution." *Gabriel v. Cty. of Herkimer*, 889 F. Supp. 2d 374, 406 (N.D.N.Y. 2012) (alteration in original) (quoting N.Y. Est. Powers & Trusts Law § 1–

2.5).  The damages available "in [] actions for wrongful death are the fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought." *Zikianda*, 2015 WL 5510956, at *61 (brackets and internal quotation marks omitted).

The Court readily finds the first, second, and fourth elements sufficiently plead here. *See Pratt v. George Spalty Sons, Inc.*, 516 N.Y.S.2d 433, 435 (Sup. Ct. 1987) (noting that "the 'personal representative' of a decedent to maintain a wrongful death action . . . encompasses both executors and administrators").  The Second Amended Complaint alleges that "Decedent died intestate on January 29, 2013 at approximately 6:16 a.m.," (SAC ¶ 107), and that Plaintiff was "duly appointed" as administratrix of Decedent's estate, (*id.* ¶ 4).  As discussed in detail above, the Second Amended Complaint states a plausible claim for medical malpractice against Westchester Defendants, which then serves as the predicate for the Eighth Cause of Action.

As to the third element, Westchester Defendants first argue that the pleading is defective because "[D]ecedent's distributees are not identified," (Westchester Defs.' Mem. 31), citing *Chong* in support of the proposition that "[t]he allegation that he has 'at least four children' who are his surviving 'next of kin' does not satisfy the statutory requisite that the action be brought on behalf of his actual, surviving distributes [sic]," (*id.* (citing *Chong*, 441 N.Y.S.2d at 26)).  The court in *Chong*, however, actually read an allegation "that decedent had 'next of kin,' consisting of his wife and children," to mean "distributees" for purposes of a wrongful death cause of action.  441 N.Y.S.2d at 26.  This line of argument by Westchester Defendants is thus wholly unavailing, especially given that this Court has found no authority to even suggest that a complaint must more specifically identify distributees at the motion-to-dismiss stage.

Westchester Defendants also argue that "the damages sought here are not proper elements of the pecuniary losses under [New York law]." (Westchester Defs.' Mem. 31.) The Court finds this argument only partially correct. On one hand, New York law "has steadfastly restricted recovery to 'pecuniary injuries,' or injuries measurable by money, and denied recovery for grief, loss of society, affection, conjugal fellowship[,] and consortium." *Gonzalez v. N.Y.C. Hous. Auth.*, 572 N.E.2d 598, 600–01 (N.Y. 1991); *see also Negron v. City of N.Y.*, 976 F. Supp. 2d 360, 374 n.9 (E.D.N.Y. 2013) (same). The loss of Decedent's "comfort and the enjoyment of his society," therefore, is not recoverable. (*See* SAC ¶ 107.) Nonetheless, Plaintiff does allege that Decedent's next of kin suffered pecuniary loss that *is* indeed recoverable. Under New York law, "the essence of the cause of action for wrongful death . . . is that the [distributees'] reasonable expectancy of future assistance or support by the decedent was frustrated by the decedent's death." *Gonzalez*, 572 N.E.2d at 601. These recoverable damages broadly include "[l]oss of support, voluntary assistance and possible inheritance, as well as medical and funeral expenses incidental to death . . . ." *Id.* In alleging loss of "a reasonable expectation of support from . . . Decedent," (SAC ¶ 107), the Second Amended Complaint satisfies this third element.

Accordingly, Plaintiff's wrongful death cause of action survives Westchester Defendants' Motion.[17]

---

[17] As a word of caution, the Court notes that, going forward, Plaintiff will need to offer proof of pecuniary loss. *See Gonzalez*, 572 N.E.2d at 600–01. "The fact that there are children who are distributees of the estate is not, by itself, sufficient to establish that there was a pecuniary loss." *Pub. Adm'r of Queens Cty. ex rel. Estate & Beneficiaries of Guzman v. City of N.Y.*, No. 06-CV-7099, 2009 WL 498976, at *12 (S.D.N.Y. Feb. 24, 2009).

f. <u>Punitive Damages</u>

As the Ninth Cause of Action, Plaintiff seeks "an award of punitive damages" from Smith on the basis that her actions "against . . . Decedent were carried out in a deliberate, cold, callous, and intentional manner in order to injure and damage [Decedent], his heirs, and survivors . . . ."  (SAC ¶ 110.)[18]

However, there is no separate claim for punitive damages recognized under New York law.  *See Weir Metro Ambu-Serv., Inc. v. Turner*, 442 N.E.2d 1268, 1268 (N.Y. 1982) ("[P]unitive damages may not be sought as a separate cause of action."); *Paisley v. Coin Device Corp.*, 773 N.Y.S.2d 582, 583 (App. Div. 2004) (dismissing punitive damages claim because "no separate cause of action for punitive damages lies for pleading purposes"); *accord Henry v. Concord Limousine, Inc.*, No. 13-CV-494, 2014 WL 297303, at *5 (E.D.N.Y. Jan. 24, 2014) ("[I]t is well settled under New York law that punitive damages may not be asserted as a separate cause of action.").  This final claim is thereby dismissed, though Plaintiff may still seek punitive damages in connection with any appropriate causes of action that remain.  *See Campbell v. Aduddell*, No. 11-CV-1413, 2014 WL 4659364, at *7 (N.D.N.Y. Sept. 17, 2014) (permitting the plaintiff to include in her amended complaint a "request [for] punitive damages as an element of damages in connection with any or all of her causes of action"); *Patterson ex rel. T.P. v. Elmsford Union Free Sch. Dist.*, No. 11-CV-5133, 2012 WL 860367, at *12 n.5 (S.D.N.Y. Feb. 27, 2012) (dismissing separate claim for punitive damages but noting that the "[p]laintiff may still seek punitive damages, but not as a separate cause of action and not against the [government entity]").

---

[18] While the Second Amended Complaint does not appear to seek such relief from Westchester itself, the Court nonetheless reiterates that the municipality would not be subject to punitive damages.  *See Martinez*, 999 F. Supp. 2d at 433.

### III.  Conclusion

For the foregoing reasons, Empress Defendants' Motion To Dismiss is granted in its

entirety and Westchester Defendants' Motion To Dismiss is granted in part and denied in part.[19]

The Clerk of the Court is respectfully requested to terminate the pending Motions.  (*See* Dkt.

Nos. 63, 66.)

SO ORDERED.

DATED:      March 29, 2016
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[19] The Court dismisses the federal claims discussed herein with prejudice "because [P]laintiff has already had two bites at the apple[,] and they have proven fruitless." *Treppel v. Biovail Corp.*, No. 03-CV-3002, 2005 WL 2086339, at \*12 (S.D.N.Y. Aug. 30, 2005); *see also Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Anthony v. Brockway*, No. 15-CV-451, 2015 WL 5773402, at \*3 (N.D.N.Y. Sept. 30, 2015) (dismissing amended complaint with prejudice where the "[p]laintiff has already been given one opportunity to amend his complaint . . ., and there is nothing in his second amended complaint suggesting that [he] could do better given another opportunity"); *Al-Qadaffi v. Servs. for the Underserved*, No. 13-CV-8193, 2015 WL 585801, at \*8 (S.D.N.Y. Jan. 30, 2015) (denying leave to amend where "[the plaintiff] has already had one chance to amend his [c]omplaint, and there is still no indication that a valid claim might be stated if given a second chance"), *aff'd*, —F. App'x —, 2016 WL 320938 (2d Cir. Jan 27, 2016); *Bui v. Indus. Enters. of Am., Inc.*, 594 F. Supp. 2d 364, 373 (S.D.N.Y. 2009) (dismissing an amended complaint with prejudice where the plaintiff failed to cure the deficiencies identified in his complaint despite "being given ample opportunity to do so").