UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ERICA MELVIN as Administratrix of the
Estate of RASHAD MCNULTY, Deceased,

                                Plaintiff,

                v.

COUNTY OF WESTCHESTER; CORRECT
CARE SOLUTIONS, LLC; NEW YORK
CORRECT CARE SOLUTIONS MEDICAL
SERVICES PC; RAUL ULLOA;
PAULETTE SMITH; DIANE JORDAN; and
EMS JOHN DOE,

                                Defendants.

No. 14-CV-2995 (KMK)

OPINION & ORDER

Appearances:

Jared R. Rice, Esq.
Rice & Rice Attorneys At Law
New Rochelle, NY
*Counsel for Plaintiff*

John M. Murtagh, Jr., Esq.
Denise M. Cossu, Esq.
Jaazaniah Asahguii, Esq.
Lisa C. Florio, Esq.
Ted. A. Novick, Esq.
Gaines, Novick, Ponzini, Cossu & Venditti, LLP
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Erica Melvin ("Plaintiff"), as administratrix of the estate of Rashad McNulty, deceased

("Decedent"), brings this Action against the County of Westchester ("Westchester"), Correct

Care Solutions, LCC ("CCS"), New York Correct Care Solutions Medical Services, PC

("NYCCS"), Dr. Raul Ulloa ("Dr. Ulloa"), Nurse Paulette Smith ("Smith"), and Nurse Diane Jordan ("Jordan") (collectively, "Defendants"). (Second Am. Compl. ("SAC") (Dkt. No. 53).) Before the Court are Plaintiff's Motion for Summary Judgment on all claims ("Plaintiff's Motion"), (see Pl.'s Not. of Mot. for Summ. J. ("Pl.'s Mot.") (Dkt. No. 230)), and Defendants' Motion for Partial Summary Judgment on Plaintiff's Eighth Amendment deliberate indifference claim and state law breach of contract claim ("Defendants' Motion"), (see Defs.' Not. of Mot. for Summ. J. ("Defs.' Mot.") (Dkt. No. 229)).

For the following reasons, Plaintiff's Motion is denied, and Defendants' Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are taken from the Parties' respective statements pursuant to Local Civil Rule 56.1 and the responses to those statements. (See Pl.'s Statement of Material Facts Pursuant to Local Civ. R. 56.1 ("Pl.'s 56.1") (Dkt. No. 235); Defs.' Statement of Material Facts Pursuant to Local Civ. R. 56.1 ("Defs.' 56.1") (Dkt. No. 233); Defs.' Resp. to Pl.'s 56.1 ("Defs.' 56.1 Resp.") (Dkt. No. 242); Pl.'s Resp. to Defs.' 56.1 ("Pl.'s 56.1 Resp.") (Dkt. No. 247).)[1] The facts as described below are not in dispute, except to the extent indicated.

---

[1] Plaintiff's Rule 56.1 Statement is lacking in certain critical attributes. For example, Plaintiff fails to provide support in the record to substantiate many of her statements as required by Rule 56.1(d), instead citing to the Second Amended Complaint, which is not admissible evidence. See Local Civ. R. 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). (See, e.g., Pl.'s 56.1 ¶¶ 1, 2, 5, 6.) "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). Accordingly, where Plaintiff has offered no

## 1.  The Westchester-NYCCS Contract

As of June 16, 2010, NYCCS provided medical care and treatment to inmates at Westchester County Jail ("WCJ"), pursuant to an agreement with Westchester (the "Agreement").  (Defs.' 56.1 ¶ 4.)  The Agreement provides that "the County seeks professional services in connection with the provision of comprehensive health care services to the inmates at the County's Department of Correction," and that NYCCS "shall furnish the professional services as provided and more fully described in the Department of Correction's 'Operational Requirements on Inmate Health Care' which is attached . . . as Schedule 'A.'"  (Defs.' Decl. in Supp. of Mot. for Summ. J. ("Defs.' Decl.") Ex. 6 ("Agreement"), at 1 & ¶ 1 (Dkt. No. 231).)[2] The Agreement also includes a provision that reads: "This Agreement is intended only for the benefit of the parties hereto, not for any third parties."  (Defs.' 56.1 ¶ 5; Agreement ¶ 15.)

## 2.  Events Relating to Decedent's Medical Care at WCJ

Decedent was confined to WCJ on August 9, 2011 and incarcerated there awaiting sentencing until the time of his death on January 29, 2013.  (Pl.'s 56.1 ¶ 2; Defs.' 56.1 ¶¶ 1–3.) At the time of the events underlying Plaintiff's Complaint, Decedent was a 36-year-old African-American male who measured 65 inches and weighed 190 pounds, with an obese body mass index ("BMI") of 31.  (Pl.'s 56.1 ¶ 3; Pl.'s Decl. Ex. B ("Autopsy Report").)

During a previous incarceration at WCJ in 2005, Decedent made an inmate sick call request complaining that he was having "a breathing problem" and that his chest has been "clogged up" for three days.  (Pl.'s 56.1 ¶ 7; Defs.' 56.1 Resp. ¶ 7; Pl.'s Decl. in Supp. of Mot.

---

citation to admissible evidence in the record, the Court will only consider that fact to the extent it is undisputed by Defendants.

[2] Neither Party has included Schedule "A" as an exhibit or relied on it in moving for summary judgment.

for Summ. J. ("Pl.'s Decl.") Ex. D ("2005 Medical Records") (Dkt. No. 234).) Decedent's

medical records from the visit reflect that he told the physician's assistant ("P.A."), "my chest

hurts," (2005 Medical Records 3), and the P.A. wrote that Decedent had tenderness across his

breastbone and "possible costochronditis," an inflammation of the chest cartilage. (Defs.' Decl.

in Opp'n to Mot. for Summ. J. ("Defs.' Opp'n Decl.") Ex. 48 ("Defs.' Ulloa Dep. Excerpts"), at

37 (Dkt. No. 243).)[3] However, Decedent's Report of Inmate Death, completed by Dr. Ulloa,

indicates that he "had no known significant past medical or mental health history," other than

having been seen on several occasions for toothaches. (Defs.' 56.1 ¶¶ 6, 7; Defs.' Decl. Ex. 2

("Report of Inmate Death").)

On January 16, 2013, Decedent made an inmate sick call request complaining of "body

ache, sore throat, and a runny nose for which he was prescribed 325 mg of acetaminophen

(Tylenol) and 500 mg of amoxicillin (antibiotics)." (Pl.'s 56.1 ¶ 8; Defs.' 56.1 ¶ 8; Pl.'s Decl.

Ex. E ("Jan. 16 Medical Records").) Decedent underwent a chest x-ray "to rule out pneumonia."

(Pl.'s 56.1 ¶ 8; Jan. 16 Medical Records 4.) On January 18, 2013, Dr. Ulloa received Decedent's

chest x-ray results, which indicated that he had a "prominent heart and hila." (Pl.'s 56.1 ¶ 9;

Pl.'s Decl. Ex. F ("Radiology Report").)

On January 29, 2013 at approximately 2:00 a.m., Decedent informed Corrections Officer

("C.O.") Kevin Grant ("Grant") that he was experiencing chest pain as Grant was walking past

Decedent's cell. (Pl.'s 56.1 ¶ 10; Pl.'s Decl. Ex. G ("Pl.'s Grant Dep. Excerpts"), at 11). Grant

notified the "Booking Nurse," Nurse Josh Boggi ("Boggi"), who advised Grant to send Decedent

---

[3] For exhibits that lack consistent page numbers, the Court will cite to the ECF-generated page number at the upper right corner of each page. Additionally, because the Parties have filed different excerpts of the same depositions, the Court will specify whether Plaintiff's or Defendants' deposition excerpts are referenced when citing deposition testimony.

to the WCJ Booking Clinic (the "Booking Clinic"). (Pl.'s 56.1 ¶ 11; Defs.' 56.1 Resp. ¶ 11; Pl.'s Grant Dep. Excerpts 12–13.) Grant then informed his sector supervisor, Captain Francis Delgrosso ("Delgrosso"), and called an escort to bring Decedent to the Booking Clinic. (Pl.'s 56.1 ¶ 12; Pl.'s Grant Dep. Excerpts 12–13.) Grant filled out a Report of Inmate Injury in which he wrote that Decedent was "complaining of chest pains," and Decedent indicated the same in his accompanying Inmate Statement. (Pl.'s 56.1 ¶ 14; *see also* Pl.'s Decl. Ex. J ("Inmate Injury Report and Inmate Statement").) C.O. Anthony Soto ("Soto") arrived from the booking area at approximately 2:10 a.m. and escorted Decedent to the Booking Clinic. (Pl.'s 56.1 ¶ 13; Pl.'s Decl. Ex. I ("Pl.'s Soto Dep. Excerpts"), at 13–17.) Soto testified that when he escorted Decedent to the Booking Clinic, Decedent "was complaining of chest pain," and that he observed that Decedent was walking slowly. (Pl.'s 56.1 ¶ 15; Pl.'s Soto Dep. Excerpts 22–23.)

Decedent arrived at the Booking Clinic at approximately 2:25 a.m., where Boggi was waiting for him. (Pl.'s 56.1 ¶ 16.) Boggi testified that when Decedent arrived, he "expressed his complaint" of chest discomfort, and Boggi performed an assessment, including taking Decedent's vital signs, performing an abdominal palpation, which involves "feel[ing] to see if there is any rebound tenderness," and "listen[ing] to his chest." (Pl.'s Decl. Ex. K ("Pl.'s Boggi Dep. Excerpts"), at 22.) Boggi also testified that Decedent "said he ha[d] been eating these commissary sausages frequently, and he had a few [the prior] night, and he [felt] the burning in his belly." (*Id.*) During the assessment, Soto observed Decedent "fidgeting on the chair," and testified that Boggi had difficulty taking a blood pressure reading due to Decedent's movements. (Pl.'s 56.1 ¶ 18; Pl.'s Soto Dep. Excerpts 26–27.) Boggi found that Decedent's blood pressure was "a little high but still normal." (Defs.' 56.1 ¶ 22; Defs.' Decl. Ex. 13 ("Defs.' Delgrosso Dep. Excerpts"), at 30.) Boggi noted that Decedent's pain subsided somewhat after drinking two

glasses of water.  (Defs.' 56.1 ¶ 25; Defs.' Decl. Ex. 21 ("Boggi Progress Notes"), at 3.)  After

performing his assessment, Boggi contacted the on-call doctor that night, Defendant Dr. Ulloa.

(Pl.'s 56.1 ¶ 19; Defs.' 56.1 ¶ 26; Pl.'s Boggi Dep. Excerpts 22.)  Dr. Ulloa is the medical

director of WCJ, and is employed by NYCCS.  (Defs.' 56.1 ¶ 27, 28; Defs.' Decl. Ex. 22

("Defs.' Ulloa Dep. Excerpts"), at 4–5.)  Boggi informed Dr. Ulloa that Decedent was

"complaining of chest burning" and that Decedent "reported that the burning sensation came

about after consuming sausages," noting that the previous night he had a similar experience

"after ingesting raw sausages."  (Defs.' Decl. Ex. 23 ("Ulloa Statement"); Defs.' Ulloa Dep.

Excerpts 44–45.)  Boggi reported to Dr. Ulloa that Decedent was fidgety, but that he felt no

dizziness; he also informed Dr. Ulloa that Decedent denied a history of cardiac issues in his

family and denied being a smoker.  (Defs.' 56.1 ¶¶ 35–38; Ulloa Statement.)  Dr. Ulloa

diagnosed Decedent as having acid indigestion, and ordered Boggi to give Decedent Mylanta and

Zantac, and to "keep an eye on him" and call back in an hour.  (Pl.'s 56.1 ¶ 21; Defs.' Ulloa Dep.

Excerpts 45.)  Soto then escorted Decedent to WCJ's "Old Jail Clinic" (the "Old Clinic") to

receive the medications; Soto noted that the walk took longer than usual, and that Decedent again

expressed that his chest was hurting.  (Pl.'s 56.1 ¶ 23; Pl.'s Soto Dep. Excerpts 32–33.)

Decedent and Soto arrived at the Old Clinic at approximately 2:55 a.m., where they

encountered Defendant Smith; Decedent told Smith that "his chest was hurting" and he was

waiting for his prescribed medication.  (Pl.'s 56.1 ¶ 24; Pl.'s Soto Dep. Excerpts 34.)[4]  After

Decedent was seated, Defendant Jordan arrived and heard Decedent complain of burning in his

chest; Jordan also later testified that Decedent was "moaning with discomfort."  (Pl.'s 56.1 ¶ 25;

---

[4] Defendants assert that Decedent arrived at the Old Clinic at 2:40 a.m.  (Defs.' 56.1 ¶ 44.)  However, this discrepancy does not impact the claims at issue.

Pl.'s Decl. Ex. H ("Pl.'s Jordan Dep. Excerpts"), at 24, 30.) Smith testified that Decedent was "[a]t times . . . calm, but when he belched, he squealed with pain," and that at one point "he stated that he will never eat sausages again." (Pl.'s Decl. Ex. M ("Pl.'s Smith Dep. Excerpts"), at 153.) Soto recalls that Smith refused to let Decedent lie down on a table, but that Soto let him lie down anyway. (Pl.'s 56.1 ¶ 27; Pl.'s Soto Dep. Excerpts 43–44.)[5] Decedent continued to complain of chest pain while he awaited his medication. (Pl.'s 56.1 ¶ 28; Pl.'s Jordan Dep. Excerpts 28, 30.)[6]

Boggi arrived at the Old Clinic shortly after Decedent arrived there and administered Decedent's prescribed medication at approximately 3:00 a.m.; Boggi wrote in his Progress Notes that Decedent should be "[r]eassess[ed] in 45 minutes" after receiving the medicine. (Pl.'s Boggi Dep. Excerpts 26; Pl.'s Soto Dep. Excerpts 47–48; Boggi Progress Notes 1.) After taking his medication, Soto and Boggi took Decedent back to the Booking Clinic "to be observed until 4:00 a.m." pursuant to Dr. Ulloa's orders. (Pl.'s 56.1 ¶ 31; Pl.'s Boggi Dep. Excerpts 30–31.) Smith observed that Decedent "ambulated at a steady gait and [was] in no distress" as he left the Old Clinic area. (Defs.' 56.1 ¶ 54; Defs.' Decl. Ex. 26 ("Defs.' Smith Dep. Excerpts Pt. 1"), at 160.)[7] At the Booking Clinic, Decedent was placed in a holding cell which consisted of a sink, toilet,

---

[5] Smith disputes this account, saying that Soto in fact told Decedent he couldn't lie down when he first asked, but relented and allowed him to lie down when he asked again. (*See* Defs.' Opp'n Decl. Ex. 54 ("Defs.' Smith Dep. Excerpts Pt. 2"), at 68–69.)

[6] Smith submitted a written statement the day after Decedent's death in which she states that she was never informed Decedent's initial complaint was chest pains because she did not perform his initial assessment. (*See* Defs.' Decl. Ex. 24 ("Smith Statement"), at 3.)

[7] Plaintiff disputes Smith's recollection, stating Decedent "was not able to walk into his cell block without leaning on the wall for several seconds." (Pl.'s 56.1 Resp. ¶ 54.) However, it was not until after Decedent was discharged from the Booking Clinic almost an hour later that witnesses observed him leaning against walls for support while walking. (*See* Pl.'s 56.1 ¶ 35.)

and steel bench. (Pl.'s 56.1 ¶ 32; Pl.'s Soto Dep. Excerpts 49–50.) At approximately 4:00 a.m., Boggi informed Smith that Decedent reported feeling better, and Decedent was cleared to return to his cell. (Pl.'s 56.1 ¶¶ 33–34; Def.'s 56.1 ¶ 55; Defs.' Decl. Ex. 17 ("Defs.' Boggi Dep. Excerpts"), at 35.)[8]

At approximately 4:15 a.m., on his way back to his cell but prior to entering the door to his housing unit, Decedent leaned on a wall for a few seconds, took several steps, and leaned against another wall. (Pl.'s 56.1 ¶ 35; Video File: WCJ Surveillance Camera Footage ("Surveillance Footage").)[9] At 4:16 a.m., as he entered his housing unit, Decedent complained that he was feeling dizzy. (Pl.'s 56.1 ¶ 36; Pl.'s Soto Dep. Excerpts 57.) At 4:16:26 a.m., Decedent leaned against a wall for several seconds, and then began to fall backwards; he was "guided down to the floor by correction staff." (Pl.'s 56.1 ¶ 37; *see also* Surveillance Footage; Pl.'s Soto Dep. Excerpts 58; Pl.'s Grant Dep. Excerpts 49.) The C.O.s placed Decedent "in a recovery position on his side" and attempted to communicate with him; C.O. Dominick

---

[8] Boggi and Smith have differing accounts of who cleared Decedent to return to his cell; Boggi reported that Smith advised him to clear Decedent and return him to his cell, while Smith testified that Boggi made the determination that Decedent should return to his cell. (*See* Pl.'s Boggi Dep. Excerpts 39; Defs.' Smith Dep. Excerpts Pt. 2 71.) Additionally, Smith notes in her Progress Notes written the following day that Decedent "was alert & coherent with appropriate verbal responses" and "ambulated independently with steady gait" while being escorted back to his cell. (*See* Defs.' 56.1 ¶¶ 57, 58; Defs.' Decl. Ex. 25 ("Smith Progress Notes"), at 1.) However, the source of this information is unclear, as Smith was not present when Decedent was escorted back to his cell, and Plaintiff disputes Smith's account, pointing to Decedent's collapse shortly thereafter and Soto's testimony that Decedent was walking slowly and "walking next to the wall" for support. (*See* Pl.'s 56.1 Resp. ¶¶ 57, 58; Pl.'s Soto Dep. Excerpts 56–57; Surveillance Footage.)

[9] No Party has objected to the admissibility or authenticity of the Surveillance Footage. The Court therefore considers the footage in deciding the pending Motions for Summary Judgment. *See Capobianco v. City of New York*, 422 F.3d 47, 55 (S.D.N.Y. 2005) ("[I]nadmissible [evidence] may be considered by the court if not challenged. The objection must be timely or it will be deemed to have been waived." (citation and quotation marks omitted)).

Manocchi ("Manocchi") observed that Decedent's lips were a bluish white color, and that he was sweating profusely and mumbling incoherently. (Pl.'s 56.1 ¶ 38; Pl.'s Soto Dep. Excerpts 58–59; Pl.'s Decl. Ex. O ("Pl.'s Manocchi Dep. Excerpts"), at 13–14.) Grant made a "Signal 3" emergency call requesting medical assistance. (Pl.'s 56.1 ¶ 38; Defs.' 56.1 ¶ 64; Pl.'s Grant Dep. Excerpts 49.)

Smith and Boggi responded to the emergency signal, arriving at the scene at approximately 4:20 a.m. (Pl.'s 56.1 ¶ 40; Surveillance Footage.) Decedent was lying on the floor face down when they arrived. (*See* Surveillance Footage.) Smith asked Decedent what happened, but he was initially unresponsive. (Pl.'s 56.1 ¶ 41; Pl.'s Smith Dep. Excerpts 161.) Smith performed a physical assessment of Decedent, including rubbing his sternum, checking his pulse, performing a "capillary refill test," checking whether his pupils were reactive to light, and taking a blood pressure reading, which was recorded as being high. (Pl.'s 56.1 ¶ 45; Defs.' 56.1 ¶¶ 68–70; Defs.' Opp'n Decl. Ex. 54 ("Defs.' Smith Dep. Excerpts Pt. 2"), at 78–81, 165–68.)[10] Smith testified that she asked Decedent if he had any pain or discomfort and he verbally responded, "no"; she also recalled hearing "peristalsis" (loud stomach noises) while kneeling beside him. (Defs.' 56.1 ¶¶ 72–73; Defs.' Smith Dep. Excerpts Pt. 2, at 169–70.) Delgrosso arrived on the scene at approximately 4:23 a.m. and observed that Decedent was "conscious but dazed" and "[g]enerally paranoid," and that "he did not seem completely awake and aware of his surroundings." (Pl.'s 56.1 ¶ 44; Pl.'s Decl. Ex. Q ("Pl.'s Delgrosso Dep. Excerpts"), at 35–36.) Boggi, who was assisting Smith with the physical assessment of Decedent, performed a "pulse

---

[10] A capillary refill test involves squeezing a finger and monitoring how quickly blood flow returns to the extremity in order to determine that "there is enough oxygen and blood flowing through the body." (*See* Defs.' Smith Dep. Excerpts Pt. 2 80–81.)

ox" to determine his pulse and, finding that it was low, told Smith, "not good." (Pl.'s 56.1 ¶ 46; Pl.'s Boggi Dep. Excerpts 45–46.)

Jordan also arrived on the scene at approximately 4:23 a.m., eight minutes after Decedent's initial collapse, and assisted Smith with administering smelling salts to Decedent. (Pl.'s 56.1 ¶ 47; Pl.'s Manocchi Dep. Excerpts 14–15.) Once responsive, Smith told Decedent that if he is able to get into a wheelchair, he would be brought back to "the clinic" for treatment. (Pl.'s 56.1 ¶ 48; Defs.' 56.1 ¶ 75; Pl.'s Manocchi Dep. Excerpts 15; Pl.'s Soto Dep. Excerpts 68; Pl.'s Boggi Dep. Excerpts 47–48.) Decedent stood up and got in the wheelchair; Smith then accused Decedent of faking his condition, saying his conduct was "the oldest trick" to get medical treatment and that she'd been "doing this too long" to be fooled, and directed the C.O.s to return Decedent to his cell. (Pl.'s 56.1 ¶ 49; Pl.'s Manocchi Dep. Excerpts 15; Pl.'s Grant Dep. Excerpts 52; Pl.'s Soto Dep. Excerpts 69; Pl.'s Boggi Dep. Excerpts 48.)[11]

Smith took Decedent's blood pressure again while he was seated in the wheelchair, noting that it was elevated. (Pl.'s 56.1 ¶ 51; Defs.' Smith Dep. Excerpts Pt. 2 170–71.) Then, Decedent's stomach made a loud "gurgling" noise, and said he needed to use the bathroom. (Pl.'s 56.1 ¶ 51; Pl.'s Boggi Dep. Excerpts 49; Defs.' Smith Dep. Excerpts Pt. 1 168, 171; Pl.'s Soto Dep. Excerpts 69.) Decedent was brought back to his cell, where he got up on his own and walked over to the toilet. (Pl.'s 56.1 ¶ 54; Pl.'s Soto Dep. Excerpts 71.) Decedent was locked in his cell, and Smith told him to "do number two and [he] will feel better." (Pl.'s 56.1 ¶ 54; Pl.'s Soto Dep. Excerpts 71; Pl.'s Delgrosso Dep. Excerpts 40.) Smith, Boggi, Delgrosso, Soto, and Manocchi all left the housing unit, while Grant returned to his rounds with instructions to check in on Decedent; Smith recalls telling Grant to periodically check on Decedent during his rounds

---

[11] Smith denies making this statement. (*See* Defs.' Smith Dep. Excerpts Pt. 2 194–95.)

and to let her know when Decedent was finished using the toilet so she could return to check on him.  (Pl.'s 56.1 ¶ 55; Defs.' 56.1 ¶¶ 85, 86; Pl.'s Delgrosso Dep. Excerpts 41; Defs.' Opp'n Decl. Ex. 51 ("Defs.' Boggi Dep. Excerpts"), at 51–52.)

Grant testified that he checked on Decedent three times between 4:31 a.m. and 5:00 a.m. (Pl.'s 56.1 ¶ 56.)  During his first check at approximately 4:45 a.m., Decedent was still on the toilet.  (Pl.'s 56.1 ¶¶ 56, 57; Pl.'s Grant Dep. Excerpts 52.)  Grant testified that he heard an "out of the ordinary moan" that he'd never heard a human make before.  (Pl.'s 56.1 ¶¶ 56, 57; Pl.'s Decl. Ex. R ("207-c Hearing Tr."), at 17–19.)  Grant checked on Decedent again at 4:50 a.m. after hearing him moaning so loud that it woke up the other inmates; Decedent was lying on his mattress and told Grant that he was in a lot of pain, and that he had never felt anything like it before.  (Pl.'s 56.1 ¶ 59; Defs.' 56.1 ¶¶ 90, 91; Pl.'s Grant Dep. Excerpts 52; 207-c Hearing Tr. 18–19.)  The moaning subsided, but then resumed a few minutes later; Grant heard Decedent say aloud that he doesn't want to die in jail.  (Pl.'s 56.1 ¶ 62; 207-c Hearing Tr. 18–19.)  When Grant checked on him again at 5:00 a.m., Grant called Decedent's name three times but received no response, although he could see him breathing.  (Pl.'s 56.1 ¶ 62; Defs.' 56.1 ¶ 96; Pl.'s Grant Dep. Excerpts 56–59.)  At approximately 5:00 a.m., Grant called Smith and informed her that Decedent was breathing but no longer communicating with him, and Smith said she would come down immediately.  (Pl.'s 56.1 ¶ 63; Pl.'s Smith Dep. Excerpts 177.)

When Smith arrived, she found Decedent unresponsive on his bed, and directed Grant to make a "Signal 3" emergency call.  (Pl.'s 56.1 ¶ 65; 207-c Hearing Tr. 20; Pl.'s Grant Dep. Excerpts 60.)  Grant assisted Smith in sliding Decedent's mattress to the floor with him on it; Grant testified that he observed Decedent take a substantial gasp of air.  (Pl.'s 56.1 ¶ 66; 207-c Hearing Tr. 20, 24.)  Smith began doing chest compressions, pausing briefly to give Grant her

cell phone and instruct him to call 911 as Delgrosso arrived on the scene. (Pl.'s 56.1 ¶ 67; 207-c Hearing Tr. 20; Pl.'s Delgrosso Dep. Excerpts 46–47.) Delgrosso took Smith's cell phone and called 911 and asked for an ambulance for an inmate in distress. (Pl.'s 56.1 ¶ 68; Pl.'s Delgrosso Dep. Excerpts 47.) When the call ended, Smith asked Grant to call Dr. Ulloa; once Dr. Ulloa was on the line, Grant held the phone to Smith's ear and she informed him she was doing CPR on a patient. (Pl.'s 56.1 ¶ 69; 207-c Hearing Tr. 21.) Smith then called for a defibrillator and an "Ambu bag," a piece of medical equipment one puts over their mouth to perform CPR; Jordan was on her way with a bag of medical equipment, but had not yet arrived at that point. (Pl.'s 56.1 ¶ 70; 207-c Hearing Tr. 21–22; Pl.'s Delgrosso Dep. Excerpts 48–49.) When Jordan arrived, she assisted Smith by "giving . . . Decedent respirations using a mouthpiece." (Pl.'s 56.1 ¶ 71; Pl.'s Jordan Dep. Excerpts 54.) At approximately 5:16 a.m., Boggi arrived with a defibrillator, and Smith applied it to Decedent while Boggi took over performing CPR. (Pl.'s 56.1 ¶ 72; 207-c Hearing Tr. 22.) CPR continued until paramedics arrived at approximately 5:36 a.m.; the paramedics noted that Decedent was unresponsive due to what appeared to be cardiac arrest. (Pl.'s 56.1 ¶ 73; Pl.'s Decl Ex. T ("Ambulance Report").)

At approximately 6:03 a.m., Decedent left WCJ with the paramedics and arrived at Westchester Medical Center ("WMC") at approximately 6:08 a.m. (Pl.'s 56.1 ¶ 74.) He was pronounced dead at 6:10 a.m. due to a blocked coronary artery. (*Id.*) A subsequent autopsy later listed his cause of death as Stenosing Coronary Arteriosclerosis. (*Id.*; Autopsy Report)

B.  Procedural Background

Plaintiff commenced the instant Action on April 28, 2014, bringing claims against Westchester County, CCS, NYCCS, Empress Ambulance Service Inc. ("Empress"), Robert Astorino, two John Doe correction officers, Dr. Ulloa, Dolores Curbelo M.D., and several Doe

Defendants.  (*See* Compl. (Dkt. No. 1).)[12]  On July 25, 2014, Plaintiff filed an Amended

Complaint naming Kevin Cheverko, Watson Jean-Baptiste, Smith, Kim Embree, Boggi, Jordan,

and Gregorio Castro ("Castro") in place of several of the Doe Defendants, leaving C.O. John

Does #1 and #2 and EMS John Doe as the remaining unidentified defendants.  (*See* Am. Compl.

(Dkt. No. 31).)  Plaintiff then filed her Second Amended Complaint on December 8, 2014, which

removed Kim Embree, Watson Jean-Baptiste, Robert Astorino, Kevin Cheverko, and the John

Doe correction officers.  (*See* SAC.)

On April 17, 2015, Defendants Westchester, CCS, NYCCS, Boggi, Jordan, Smith, and

Dr. Ulloa (the "Westchester Defendants") filed a Motion To Dismiss the Second Amended

Complaint.  (Dkt. No. 63.)  That same day, Empress and Castro (the "Empress Defendants")

submitted their own Motion To Dismiss and supporting papers, which included a Verified

Answer to Plaintiff's Second Amended Complaint.  (Dkt. Nos. 66–68.)[13]  Plaintiff filed her

opposition papers to the Motions on June 12, 2015 and June 30, 2015, respectively, (Dkt. Nos.

82–83, 89–90), and Defendants submitted their respective replies on July 2, 2015 and July 9,

2015, (Dkt. Nos. 92, 98).  The Court denied Plaintiff's application for leave to file a sur-reply in

opposition to the Motions.  (Dkt. No. 97.)

On March 29, 2016, the Court issued an Opinion and Order granting the Empress

Defendants' Motion, and granting in part and denying in part the Westchester Defendants'

Motion.  (*See* Op. & Order on Defs.' Mots. To Dismiss ("Opinion") (Dkt. No. 99).)  With respect

---

[12] A Notice of Claim pursuant to New York General Municipal Law § 50-e was timely served on Westchester on March 13, 2013.  (SAC ¶ 66.)  An amended Notice of Claim was served on March 26, 2014.  (*Id.*)

[13] EMS John Doe, an employee of Empress who allegedly transported Decedent to WMC along with Castro, (*see* Opinion 5), was never identified, named, or served in this Action.  In any event, all claims against Empress and its employees were dismissed for failure to state a claim.

to the Empress Defendants, the Court dismissed Plaintiff's federal claims against Castro for failure to state a claim, and against Empress for failure to establish municipal liability as required to state a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and declined to exercise supplemental jurisdiction over Plaintiff's state law claims; the Empress Defendants were therefore dismissed from this Action.  (*See* Opinion 26, 38, 43.)  With respect to the Westchester Defendants, the Court denied the Motion with respect to Plaintiff's federal deliberate indifference claims against Boggi, Smith, and Jordan, but granted it with respect to Dr. Ulloa.  (*See id.* at 23.)  The Court also dismissed Plaintiff's deliberate indifference claims against Westchester, CCS, and NYCSS for failure to establish municipal liability under *Monell*.  (*See id.* at 35.)  The Court then dismissed Plaintiff's supervisory liability claims against Dr. Ulloa, finding Plaintiff's allegations too conclusory to state a claim.  (*See id.* at 39–41.)  The Court denied the Westchester Defendants' Motion with respect to Plaintiff's state law medical malpractice, breach of contract, and wrongful death claims, but granted the Motion on Plaintiff's negligent hiring, supervision, and retention claims.  (*See id.* at 44–53.)  The case was then referred to the Hon. Judge Lisa M. Smith for pretrial discovery.  (Dkt. No. 107.)

On July 20, 2016, pursuant to stipulation of voluntary dismissal, the Court dismissed Plaintiff's wrongful death claims against Defendants.  (Dkt. No. 118.)  On April 26, 2017, the Court approved a settlement between Plaintiff and Defendant Boggi.  (Dkt. No. 185.)  On July 31, 2018, Plaintiff voluntarily dismissed her deliberate indifference claims against Defendant Jordan.  (*See* Defs.' Decl. in Supp. of Mot. for Partial Summ. J. ("Defs.' Decl.") Ex. 42 ("Jordan Stip.").)

On August 20, 2018, the Parties filed the instant Motions and accompanying papers.  (*See* Pl.'s Mot.; Pl.'s 56.1; Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No.

14

236); Pl.'s Decl. in Supp. of Mot. for Summ. J. ("Pl.'s Decl.") (Dkt. No. 234); Defs.' Mot.;

Defs.' 56.1; Defs.' Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Defs.' Mem.") (Dkt.

No. 232); Defs.' Decl.)  On September 24, 2018, the Parties filed their opposition memoranda

and accompanying papers.  (*See* Pl.'s 56.1 Resp.; Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for

Partial Summ. J. ("Pl.'s Opp'n") (Dkt. No. 246); Pl.'s Decl. in Opp'n to Mot. for Partial Summ.

J. ("Pl.'s Opp'n Decl.") (Dkt. No. 244); Defs.' 56.1 Resp.; Defs.' 56.1 Counter. of Material Facts

("Defs.' Counter.") (Dkt. No. 241); Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J.

("Defs.' Opp'n") (Dkt. No. 245); Defs.' Decl. in Opp'n to Mot. for Summ. J. ("Defs.' Opp'n

Decl.") (Dkt. No. 243).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same).  "In determining whether summary judgment is appropriate," a court must

"construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River

v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the

movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800

Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

 "However, when the burden of proof at trial would fall on the nonmoving party, it

ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an

essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (citations and quotation marks omitted); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006) ("[I]t is the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases." (citations and quotation marks omitted)).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

### B.  Deliberate Indifference Claims

The Parties cross-move for summary judgment on Plaintiff's remaining Eighth Amendment claim against Smith for deliberate indifference to Decedent's medical needs.  Plaintiff argues that there is no dispute that Smith knew of and disregarded an excessive risk to Decedent's health by "den[ying] him life-saving medical care."  (*See* Pl.'s Mem. 6–14.)  On the other hand, Defendants argue that the undisputed facts demonstrate that Decedent was provided reasonable medical care, and that Plaintiff's deliberate indifference claim therefore fails as a matter of law.  (*See* Defs.' Mem. 8–11.)

### 1.  Applicable Law

"The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners."  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quotation marks omitted) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  "There are two

elements to a claim of deliberate indifference to a serious medical condition." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009), *overruled on other grounds by Darnell v. Pineiro*, 581 F.3d 63 (2d Cir. 2017). "The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone*, 719 F.3d at 138 (quotation marks omitted). Under this objective requirement, a court must inquire first, "whether the prisoner was actually deprived of adequate medical care," and second, "whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006). The latter requires the Court "to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* at 280. As part of this objective element, "the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has presented "a non-exhaustive list" of factors to consider: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Id.*; *see also Morales v. Fischer*, 46 F. Supp. 3d 239, 247 (W.D.N.Y. 2014) (same).

"The second requirement is subjective: the charged officials must be subjectively reckless in their denial of medical care." *Spavone*, 719 F.3d at 138. Here, the inquiry is whether defendants "knew of and disregarded an excessive risk to [a plaintiff's] health or safety" while "both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." *Caiozzo*, 581 F.3d at 72 (alterations and quotation

marks omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference.").  "Deliberate indifference is a mental state equivalent to subjective recklessness," and it "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (quotation marks omitted); *see also Gladden v. City of New York*, No. 12-CV-7822, 2013 WL 4647193, at *2 (S.D.N.Y. Aug. 29, 2013) ("To meet the subjective element, the plaintiff must show that the defendant acted with more than mere negligence, and instead knew of and disregarded an excessive risk to inmate health or safety." (citation and quotation marks omitted)).  In contrast, "mere medical malpractice is not tantamount to deliberate indifference," unless "the malpractice involves culpable recklessness, i.e., . . . a conscious disregard of a substantial risk of serious harm." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (citation and quotation marks omitted).  Moreover, "mere disagreement over the proper treatment does not create a constitutional claim," and "so long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*; *see also Crique v. Magill*, No. 12-CV-3345, 2013 WL 3783735, at *3 (S.D.N.Y. July 9, 2013) ("The mere fact that an inmate feels that he did not receive adequate attention . . . does not constitute deliberate indifference.").

2.  Analysis

With respect to the objective prong, Defendants argue there is at least a dispute of fact regarding whether Decedent's deprivation of medical care was sufficiently serious.  Defendants, citing *Salahuddin*, argue that because the record demonstrates that some medical care was provided, and the only dispute, if any, is whether that care was insufficient or delayed, the Court

should narrowly focus on the delay in provision of care resulting from Decedent's need to use the toilet after his collapse. (*See* Defs.' Opp'n 9–10.) *See Salahuddin*, 467 F.3d at 280 ("In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focuses on the challenged delay or interruption in treatment rather than the prisoners underlying medical condition alone.'" (alteration omitted) (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003))).

Defendants are correct that "the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith*, 316 F.3d at 185. The core question is whether Decedent "was actually deprived of adequate medical care." *Salahuddin*, 467 F.3d at 279. "Medical care is adequate where the care provided is a 'reasonable' response to the inmate's medical condition." *Berman v. Durkin*, No. 13-CV-136, 2017 WL 1215814, at *11 (N.D.N.Y. Mar. 10, 2017) (citing *Salahuddin*, 467 F.3d at 279), *adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017). "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith*, 316 F.3d at 186.

With respect to Plaintiff's Motion, and drawing all inferences in favor of Defendants, Smith was at least initially under the impression that Decedent suffered only from indigestion when he was cleared to return to his cell. However, a seemingly minor injury that ultimately becomes far more serious due to delay in treatment may satisfy the objective prong of the deliberate indifference standard. *See Smith*, 316 F.3d at 186 ("[T]he failure to provide treatment

for an otherwise insignificant wound may violate the Eighth Amendment if the wound develops signs of infection, creating a substantial risk of injury in the absence of medical treatment."); *see also Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) ("Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." (citing *Salahuddin*, 467 F.3d at 281)). This principle has also been applied where a misdiagnosis led to insufficient treatment, and a defendant failed to reassess the inmate's condition despite clear signs the prescribed treatment was deficient. *See Sanchez v. N.Y. Correct Care Sols. Med. Servs., P.C.*, No. 16-CV-6826, 2018 WL 6510759, at *1–2, *7–8 (W.D.N.Y. Dec. 11, 2018) (finding objective prong met where inmate was diagnosed with dislocated shoulder but doctor failed to diagnose ruptured spleen, despite the fact that the inmate's subsequent symptoms clearly demonstrated a more serious condition); *Man Zhang v. City of New York*, No. 17-CV-5415, 2018 WL 3187343, at *7 (S.D.N.Y. June 28, 2018) (finding allegations that, despite ongoing treatment, medical staff failed to perform "appropriate medical procedures" to diagnose the plaintiff's heart condition and "connect his symptoms with his medical history" sufficiently met objective prong where the plaintiff ultimately died of heart failure); *cf. Jackson v. Johnson*, 118 F. Supp. 2d 278, 291 (N.D.N.Y. 2000) (noting that it was "troubling that [the defendant] even attempts to claim that loss of consciousness and unresponsiveness are not serious medical issues" where delayed treatment, due to an erroneous belief that the plaintiff was exaggerating his symptoms, resulted in a coma and permanent physical and mental injuries), *aff'd in part, dismissed in part*, 13 F. App'x 51 (2d Cir. 2001). This is particularly relevant here where, although initially diagnosed with indigestion, Smith became aware of Decedent's

collapse, his profuse sweating, and his low pulse, but still sent him back to his cell without notifying Dr. Ulloa that Decedent's condition had worsened, and left the area along with all other medical staff. Even construing the approximately 35-minute lapse in monitoring and treatment after Decedent's collapse as a "single delay in treatment," given Decedent's rapid decline and ultimate death, as well as Plaintiff's expert's testimony that earlier intervention could have saved Decedent's life, (*see* Pl.'s Decl. Ex. C ("Pl.'s Perry-Bottinger Dep. Excerpts"), at 81), the delay arguably "caused . . . symptoms of his underlying illness to worsen, [or] . . . materially altered the way in which his disease thereafter affected him." *Ferguson*, 2012 WL 2865474, at *4 (citation omitted); *see also Sassower v. City of White Plains*, No. 89-CV-1267, 1995 WL 222206, at *8 (S.D.N.Y. Apr. 13, 1995) ("The seriousness of a medical need may be also be determined by reference to the *effect* of denying or delaying medical treatment." (emphasis added)); *cf. Vining v. Dep't of Correction*, No. 12-CV-3267, 2013 WL 2036325, at *5 (S.D.N.Y. Apr. 5, 2013) (noting that the plaintiff's hand injury "would not have appeared urgent" to the defendants, "unlike cases where a plaintiff was discovered unconscious on the ground").

Finally, the fact that Smith returned Decedent to his cell because she assumed he was faking his symptoms, rather than based on any medical determination or assessment that he was in fact not in need of further treatment or monitoring after his collapse, strengthens Plaintiff's case that even the short delay at issue constitutes a deprivation of adequate medical care under the objective prong. *See Stevens v. Goord*, 535 F. Supp. 2d 373, 384 (S.D.N.Y. 2008) (noting that the Eighth Amendment applies "both to cases of serious illnesses where deliberate indifference 'may actually produce physical torture or a lingering death' and to less serious cases where the deliberate indifference 'may result in pain and suffering which no one suggests would serve any penological purpose.'" (quoting *Estelle*, 429 U.S. at 103)).

However, there remains a dispute of fact with respect to whether the delay worsened Decedent's condition or led to his death. Defendants' experts concluded that the delay in treatment did not have a measurable impact on Decedent's condition because his death, at that point, was inevitable. (*See* Defs.' Opp'n 19; Defs.' Opp'n Decl. Ex. 46 ("Swirsky Report"), at 4–5; Defs.' Opp'n Decl. Ex. 47 ("Evans Report"), at 4–5.) Although "actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation," *Smith*, 316 F.3d at 188, a plaintiff must demonstrate that the harm in question "resulted from the alleged shortfalls" in care, *Gonzalez v. Jones*, No. 07-CV-2126, 2010 WL 533856, at *17 (S.D.N.Y. Feb. 11, 2010), *aff'd sub nom.*, *Gonzales v. Nowak*, 443 F. App'x 615 (2d Cir. 2011). "[I]f the illness or injury was unaffected by an alleged deficiency in care, then that inconsequential lapse will not render the treatment inadequate." *Id.*

In any event, even assuming Decedent was objectively deprived of adequate medical care for his serious condition, drawing all reasonable inferences against Plaintiff, as movant, there remains a dispute of fact as to whether Smith subjectively knew of and disregarded a risk to Plaintiff's health and safety. Plaintiff argues that the record demonstrates that Smith knew of a substantial risk to Decedent's health "from the very fact that the risk was obvious." (Pl.'s Mem. 7 (quoting *Farmer*, 511 U.S. at 842).) In support, Plaintiff points to the fact that Decedent told Smith his chest was in pain and that she witnessed him "squeal[] in pain when he belched," (*see* Pl.'s Mem. 8; Pl.'s 56.1 ¶ 24–26; Pl.'s Smith Dep. Excerpts 153), Decedent's collapse on his way back to his cell after being discharged from the Booking Clinic which Smith responded to, during which his pulse was found to be "low" and witnesses said he was sweating profusely and that his lips turned a bluish white color, (*see* Pl.'s Mem. 8; Pl.'s 56.1 ¶¶ 37–38, 46; Pl.'s Soto Dep. Excerpts 58–59; Pl.'s Grant Dep. Excerpts 49; Pl.'s Manocchi Dep. Excerpts 13–14), and

the fact that other witnesses that night observed that Decedent was at risk, (*see* Pl.'s Mem. 8–9; Pl.'s 56.1 ¶¶ 15, 40, 44, 46, 56–57).  Plaintiff also argues that the record demonstrates that Smith drew the inference that a substantial risk to Decedent existed, and that she disregarded that risk. Specifically, Plaintiff argues that Smith's decision to repeatedly check in on Decedent and have Grant monitor him demonstrates that she "[r]ecogniz[ed] the gravity of the seriousness of . . . Decedent's health," (Pl.'s Mem. 9), and that the fact that she "sent him back to his cell and declined to provide him with any medical treatment whatsoever" demonstrates that she disregarded that risk, (*id.* at 11).  Plaintiff also points to her proffered expert testimony, as well as Dr. Ulloa's testimony, to argue that Smith's failure to continue taking Decedent's vital signs, including while he was on the toilet, and to contact Dr. Ulloa when she first responded to the Signal 3 emergency call after Decedent's collapse, demonstrate that she disregarded a substantial risk.  (*See* Pl.'s Mem. 12; Pl.'s Perry-Bottinger Dep. Excerpts 165, 176.)

Defendants counter that "there is no evidence that Smith was aware of any facts from which an inference could be drawn that a substantial risk of serious harm to [Decedent] would ensue from any delay in his treatment that resulted from his need to use the bathroom, nor is there any proof that Smith actually drew such an inference."  (Defs.' Opp'n 11.)  Defendants note that Decedent had "no prior medical history of any heart condition"; that he had been diagnosed with and treated for indigestion; that "when Smith arrived after the Signal 3 [call], [Decedent] did not express that he was in any pain, but rather verbalized an urgent need to use the bathroom"; and that when brought to his cell, Decedent "stood up unassisted, walked over to the toilet and used it."  (*Id.* at 11–12.)  Defendants also argue that Smith was clearly not indifferent to Decedent's condition because she indicated that she would return to check on him as soon as he finished using the bathroom.  (*See id.* at 12; Defs.' 56.1 ¶¶ 85–86.)  Finally,

Defendants argue that Smith's statement to Decedent after his collapse that she has "been doing this too long to be fooled" and that she "know[s] when they are faking" in fact demonstrates that Smith "did not apprehend any substantial risk to [Decedent]'s health and safety."  (Defs.' Opp'n 14.)

Drawing all inferences in Defendants' favor, there remains a genuine dispute of material fact regarding whether Smith actually drew the inference that there was a substantial risk to Decedent's health and safety when she sent him back to his cell.  Viewing the record as a whole, a jury could credit Smith's testimony that she believed that Decedent was suffering from indigestion and that there was no need for more serious medical intervention beyond monitoring his condition.  *See Salahuddin*, 467 F.3d at 282 (finding subjective prong was not met where the defendant incorrectly concluded that a delay in treatment created "no immediate danger" because although "[t]his may have been an unsound conclusion absent an investigation into the progression of [the plaintiff's illness], . . . the mental-state inquiry does not include an objective-reasonableness test"); *Hathaway v. Coughlin*, 37 F.3d 63, 69 (2d Cir. 1994) ("Deliberate indifference is not an inadvertent failure to provide adequate medical care."); *Williams v. Williams*, No. 13-CV-3154, 2015 WL 568842, at *6 (S.D.N.Y. Feb. 11, 2015) ("The law is clear . . . that misdiagnosis and 'the decision not to treat based on an erroneous view that the condition is benign or trivial' do not constitute deliberate indifference to [a] [p]laintiff's serious medical needs." (quoting *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000)); *cf. Candelario v. Quality Choice Corr. Healthcare*, No. 16-CV-2083, 2018 WL 2266850, at *5 (S.D.N.Y. May 17, 2018) (dismissing deliberate indifference claims where the "[p]laintiff was evaluated and [the] [d]efendants believed he was experiencing gas pain or suffering from a virus and prescribed medication to address those ailments," even though subsequent treatment revealed the plaintiff

had an abscess on his gallbladder that had to be surgically removed). Additionally, although her alleged statement accusing Decedent of "faking" his pain may arguably demonstrate a lack of empathy, it also permits the inference that Smith genuinely believed that Decedent's health was not at risk. *See McClinton v. Connolly*, No. 13-CV-2375, 2014 WL 5020593, at *5 (S.D.N.Y. Oct. 8, 2014) ("If the officers believed [the] [p]laintiff's asthma attack was a mere ruse, they could not have been aware of a substantial risk that [the] [p]laintiff would suffer serious harm."); *Hamilton v. Fisher*, No. 10-CV-1066, 2012 WL 987374, at *7 (N.D.N.Y. Feb. 29, 2012) (finding that discharging a plaintiff from the hospital "under the suspicion that [the] [p]laintiff faked a suicide attempt in order to be removed from SHU might be considered negligent conduct under certain circumstances, but that finding . . . is not sufficient to state an Eighth Amendment claim"), *adopted by* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012). Even though there were visible indications that Decedent was suffering from a more serious condition than merely indigestion after his collapse, with respect to the subjective prong, "[a] trier of fact may, but is not required to, infer knowledge even when the risk is obvious." *Beatty v. Davidson*, 713 F. Supp. 2d 167, 175 (W.D.N.Y. 2010) (citing *Salahuddin*, 467 F.3d at 281); *see also Farmer*, 511 U.S. at 844 ("That a trier of fact may infer knowledge from the obvious . . . does not mean that it must do so."); *Salahuddin*, 467 F.3d at 281 ("The defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere."); *Vail v. City of New York*, 68 F. Supp. 3d 412, 425 (S.D.N.Y. 2014) (same). The Court therefore denies Plaintiff's Motion for Summary Judgment on her deliberate indifference claim against Smith.

The Court similarly denies Defendants' Motion for Summary Judgment on Plaintiff's deliberate indifference claim against Smith, finding there is a dispute of fact regarding the

subjective prong of the Eighth Amendment analysis.  Drawing all inferences in favor of Plaintiff, a jury could find that even if Decedent was misdiagnosed with indigestion when he initially sought treatment, his subsequent collapse and poor vital signs demonstrated that there was a substantial risk of harm to Decedent of which Smith was aware, and that she deliberately disregarded that risk by returning Plaintiff to his cell, failing to contact Dr. Ulloa, and directing all medical personnel to leave the area immediately following the collapse.  (*See* Pl.'s 56.1 ¶¶ 40, 44–49, 51, 55.)  Although true that "the decision not to treat based on an erroneous view that the condition is benign or trivial" does not constitute deliberate indifference, *Harrison*, 219 F.3d at 139, a jury may find deliberate indifference if it finds that Smith "refused to verify underlying facts that she strongly suspected to be true, or declined to confirm inferences of risk that she strongly suspected to exist," *Williams*, 2015 WL 568842, at *6 (alterations omitted) (quoting *Farmer*, 511 U.S. at 843 n.8).  Given the facts that other witnesses observed Decedent's distress, (*see* Pl.'s Soto Dep. Excerpts 58–59; Pl.'s Manocchi Dep. Excerpts 13–14; Pl.'s Grant Dep. Excerpts 49), that Dr. Ulloa testified that it was inappropriate that Smith did not contact him after Decedent's collapse, (*see* Defs.' Ulloa Dep. Excerpts 73), that Plaintiff's expert found that a reasonable medical professional should have continued monitoring Decedent after his collapse, (*see* Pl.'s Decl. Ex. V ("Perry-Bottinger Report"), at 5), and that Smith accused Decedent of faking his pain despite his visible distress and poor vital signs, and in contradiction with her directive to Grant that he continue checking on Decedent, (Pl.'s 56.1 ¶¶ 45, 46, 49; Defs.' 56.1 ¶¶ 85, 86), there remains a genuine dispute of fact as to whether Smith recklessly disregarded a substantial risk to Decedent's health of which she was aware that is appropriately decided by a jury.  *See King v. Kramer*, 680 F.3d 1013, 1019 (7th Cir. 2012) (finding disputed questions of fact on deliberate indifference claims where the defendant nurse "deliberately ignored the results

of the tests she was able to administer" and other visible symptoms of a seizure); *Sanchez*, 2018 WL 6510759, at *8 (W.D.N.Y. Dec. 11, 2018) (denying summary judgment where the decedent was "exhibiting symptoms that could not be faked," such as low blood pressure, discoloration, and dropping oxygen saturation, and the "only medical care that he received was the administration of two doses of pain medication and the taking of his vital signs . . . several times"); *Fikes v. Abernathy*, No. 16-CV-843, 2018 WL 2207134, at *7 (N.D. Ala. May 14, 2018) (holding that "[a] reasonable jury could conclude that the need to treat" a plaintiff who exhibited "clear and classic symptoms of an ulcer" was "obvious even to a lay person," and that evidence showing the defendants "call[ed] him a faker" despite "obvious signs of his deteriorating condition" could constitute deliberate indifference); *Candelaria v. Erickson*, No. 01-CV-8594, 2005 WL 1529566, at *6 (S.D.N.Y. June 28, 2005) (holding that the plaintiff satisfied the subjective prong by alleging that the defendants were aware that a misdiagnosis may have occurred but failed to take additional diagnostic measures); *Jackson*, 118 F. Supp. 2d at 291 (denying summary judgment where the plaintiff "exhibited numerous symptoms and physical manifestations of a serious medical condition requiring thorough treatment," including "loss of consciousness and unresponsiveness," and the defendant "attempt[ed] to justify her actions by claiming that [the plaintiff] was feigning injury").  It is for a jury to weigh the evidence, make credibility determinations, and ultimately decide whether Smith knew of and disregarded a substantial risk to Decedent.  *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (citation omitted)); *see also Brock*, 315 F.3d at 164 ("[E]vidence that the risk was obvious or otherwise

must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." (citing *Farmer*, 511 U.S. at 842)).

Defendants argue the record demonstrates that Smith provided Decedent with medical care that was "reasonable and adequate under the circumstances then known to her." (Defs.' Mem. 10.) However, the fact that Smith provided some treatment does not foreclose a finding of deliberate indifference. *See Hudak v. Miller*, 28 F. Supp. 2d 827, 832 (S.D.N.Y. 1998) ("[T]he mere fact that the plaintiff was treated in some manner, while it may substantially weaken his claim, does not foreclose a finding of deliberate indifference if [the defendant] knew that this treatment was inadequate." (quotation marks omitted) (citing *Hemmings v. Gorczyk*, 134 F.3d 104, 108–09 (2d Cir. 1998))). The fact that Decedent's condition worsened despite treatment and that Smith chose not to consult Dr. Ulloa, return Decedent to the clinic, or otherwise alter the course of treatment, particularly where she consciously observed Decedent's deterioration and accused him of faking his symptoms rather than investigating further, could support a jury finding of deliberate indifference. *See Hemmings*, 134 F.3d at 108–09 (finding the plaintiff pled a "colorable claim" for deliberate indifference even though the plaintiff "received some medical attention, including two x-rays," where the defendants "willfully disregarded" his worsening condition, "which was easily observable"); *Hardy v. City of New York*, 732 F. Supp. 2d 112, 135 (E.D.N.Y. 2010) (finding issues of fact remained with respect to subjective prong "even though the record shows that staff was clearly monitoring [the plaintiff's] condition during th[e] two-month period during which it degenerated," because "there are unresolved issues of fact as to whether their responses to [the plaintiff's] symptoms . . . were adequate"); *Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("The fact that a plaintiff received regular medical care does not preclude a finding of deliberate indifference where the 'course of treatment was

largely ineffective and the defendant declined to do anything more to attempt to improve the plaintiff's situation.'" (alterations omitted) (quoting *Hathaway*, 37 F.3d at 68)). A reasonable jury could conclude that although Smith provided some treatment and continued to check in on Decedent, her decision to return him to his cell without medical observation, even after his collapse made clear that his prescribed treatment was insufficient, was "contrary to accepted medical standards," which can support a finding of deliberate indifference. *See Webb v. Jackson*, No. 92-CV-2149, 1994 WL 86390, at *2 (S.D.N.Y. Mar. 16, 1994) ("Medical decisions will constitute 'indifference' only when they are contrary to accepted medical standards." (citation omitted)), *aff'd*, 47 F.3d 1158 (2d Cir. 1995); *see also Stevens*, 535 F. Supp. 2d at 385 ("[M]edical decisions that are contrary to accepted medical standards may exhibit deliberate indifference, because the [medical professional] has based [her] decision on something other than sound medical judgment." (citation and quotation marks omitted)).

Therefore, both Plaintiff's and Defendants' Motions for Summary Judgment on Plaintiff's claim against Smith for deliberate indifference to Decedent's medical needs are denied.[14]

## C. State Law Claims

Plaintiff also moves for summary judgment on her remaining state law claims for medical malpractice, respondeat superior, and breach of contract. Defendants move for summary

---

[14] Because both Parties' Motions are denied with respect to Plaintiff's remaining federal claim, the Court need not consider Defendants' conditional request that the Court decline to exercise supplemental jurisdiction over the state law claims. (*See* Defs.' Mem. 11.)

judgment only on Plaintiff's breach of contract claims.[15]  The Court will address each claim in turn.

### 1. Medical Malpractice

Plaintiff argues that she is entitled to summary judgment on her medical malpractice claims against Smith, Jordan, and Dr. Ulloa.  (*See* Pl.'s Mem. 14–16.)  Specifically, Plaintiff argues that Smith breached the local standard of care "[f]or the same reasons detailed in Plaintiff's argument for deliberate indifference," that Dr. Ulloa deviated from the standard of care when he failed to perform an EKG on Decedent and failed to identify Decedent's actual ailment despite various risk factors and symptoms, and that both Smith and Jordan deviated from the standard of care by using smelling salts on Decedent.  (*Id.* at 15–16.)

Under New York law, the State owes a duty to render medical care "without undue delay," and may be liable where "delays in diagnosis and/or treatment [are] a proximate or aggravating cause of [a] claimed injury."  *Marchione v. New York*, 598 N.Y.S.2d 592, 594 (App.

---

[15] In their Opposition, Defendants cross-move for summary judgment on Plaintiff's medical malpractice and respondeat superior claims.  (*See* Defs.' Opp'n 18, 23.)  "While it is not necessarily reversible error in [the Second] Circuit for a district court to grant summary judgment against the moving party without notice or opportunity to defend," the Second Circuit has "firmly discouraged the practice."  *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000) (citing *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991) ("[The] court need not give notice of its intention to enter summary judgment against the moving party." (emphasis omitted)).  "A notice-free, sua sponte entry of summary judgment is . . . limited only to situations when there is no indication that the party against whom summary judgment would be entered could present evidence that would affect the summary judgment determination."  *ING Bank N.V. v. M/V TEMARA, IMO No. 9333929*, 892 F.3d 511, 524 (2d Cir. 2018) (italics omitted).  Here, Plaintiff had no opportunity to respond to Defendant's cross-motion.  Furthermore, both Parties filed simultaneous Motions for Summary Judgment, yet Defendants chose not to move on the medical malpractice claims despite moving on Plaintiff's other claims, thereby depriving Plaintiff of an opportunity to respond.  Given that both Parties submitted only portions of the full evidentiary record available in this case, it is not clear that Plaintiff could not present further evidence that would affect the summary judgment determination.  The Court therefore declines to consider Defendants' cross-motion included in their Opposition.

Div. 1993) (citation omitted). "To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." *Lettman v. United States*, No. 12-CV-6696, 2013 WL 4618301, at *3 (S.D.N.Y. Aug. 29, 2013) (quoting *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994)); *see also Gale v. Smith & Nephew, Inc.*, 989 F. Supp. 2d 243, 252 (S.D.N.Y. 2013) ("Under New York law, the essential elements of a medical malpractice claim are a departure from good and accepted medical practice and evidence that such departure was a proximate cause of the plaintiff's injury." (alterations and quotation marks omitted)).

Here, Plaintiff has failed to carry her burden to demonstrate that there is no dispute of material fact with respect to her medical malpractice claims against Dr. Ulloa, Smith, and Jordan. With respect to Dr. Ulloa, Plaintiff puts forth evidence in the form of expert testimony in support of her contention that the standard of care "when presented with an obese, 36-year[-]old, African[-]American male with chest pain, hypertension, and a prominent heart indicated on a recent chest x-ray, is to provide that patient with an emergency cardiac assessment, triage, and transfer to a proper medical facility, with the first step being an EKG." (Pl.'s Mem. 16; *see* Pl.'s Perry-Bottinger Dep. Excerpts 149–150, 173, 179, 194, 210–211.) Plaintiff's expert also testified that Decedent "could have survived [his] heart attack" with proper intervention, including during the period from 4:30 to 5:00 a.m. after Smith and Jordan responded to Decedent's collapse. (Pl.'s Perry-Bottinger Dep. Excerpts 81, 137.) However, Defendants' rebuttal experts came to the opposite conclusion, finding that "the medical staff acted appropriately and within the standard of care," and that even if they had not, Decedent's death "was unpreventable." (Defs.' Opp'n 19; *see* Swirsky Report 4–5; Evans Report 4–5.) "[W]hen there are dueling experts, both of whom have put forward opinions in contradiction with each

other, and when those opinions are important to resolution of a material factual dispute, summary judgment may not be appropriate." *Realtime Data, LLC v. Stanley*, 897 F. Supp. 2d 146, 153 (S.D.N.Y. 2012) (citation omitted); *see also In re Joint E & S Dist. Asbestos Lit.*, 52 F.3d 1124, 1135 (2d Cir. 1995) ("Trial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts") (quotation marks and alterations omitted)); *Perry v. City of New York*, No. 13-CV-1015, 2018 WL 1474401, at *9 (S.D.N.Y. Mar. 26, 2018) (denying summary judgment where, in addition to "the opposing views of [the] two experts, there are gaps in the facts provided that do not permit determining which view is accurate"); *Tarqui v. United States*, No. 14-CV-3523, 2017 WL 4326542, at *7 (S.D.N.Y. Sept. 27, 2017) ("Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions. Such conflicting expert opinions will raise credibility issues which can only be resolved by a jury." (citation and quotation marks omitted)); *Hamblin v. British Airways PLC*, No. 09-CV-3077, 2010 WL 11626906, at *5 (E.D.N.Y. Aug. 12, 2010) ("A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' . . . Conflicting expert opinions constitute such evidence." (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 40–41 (2d Cir. 2000))); *Katt v. City of New York*, 151 F. Supp. 2d 313, 351 (S.D.N.Y. 2001) ("[I]t is solely for the jury to weigh and assess the credibility of dueling experts."), *aff'd in part sub nom. Krohn v. New York City Police Dep't*, 60 F. App'x 357 (2d Cir. 2003), and *aff'd*, 372 F.3d 83 (2d Cir. 2004). Where, as here, "there are conflicting expert reports and testimony, summary judgment is inappropriate and the jury must decide

whether or how much to credit the evidence." *Hamblin*, 2010 WL 11626906, at \*5. Therefore, Plaintiff's Motion for Summary Judgment on her medical malpractice claims is denied.

## 2. Respondeat Superior

Plaintiff moves for summary judgment on her claim for respondeat superior liability against Westchester, CCS, and NYCCS based on the conduct of Dr. Ulloa, Smith, and Jordan. "Unlike cases brought under § 1983, municipalities may be liable for the common law torts . . . committed by their employees under the doctrine of respondeat superior." *L.B. v. Town of Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002) (italics omitted); *see also Raysor v. Port Auth.*, 768 F.2d 34, 38 (2d Cir. 1985) (dismissing § 1983 claims under *Monell* but permitting state-law claims based on respondeat superior to proceed); *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 434 (S.D.N.Y. 2012) (declining "to dismiss the pendent state law claims against [the employer-defendant] that depend on the doctrine of respondeat superior," even where the plaintiff's § 1983 claims against that defendant were dismissed). Under this doctrine, an employer can be held "vicariously liable for torts committed by an employee acting within the scope of the employment . . . , so long as the tortious conduct is generally foreseeable and a natural incident of the employment." *RJC Realty Holding Corp. v. Republic Franklin Ins. Co.*, 808 N.E.2d 1263, 1265–66 (N.Y. 2004) (quotation marks omitted).

Plaintiff has not cited any admissible evidence in support of her claim. Plaintiff asserts, without citation, that "[i]t has already been established that Dr. Ulloa, Nurse Smith, and Nurse Jordan were employees of Westchester, CCS, and NYCCS on January 29, 2013, and were acting within the scope of their duties." (Pl.'s Mem. 19–20.) Plaintiff's 56.1 Statement asserts that "Dr. Ulloa, Nurse Smith, and Nurse Jordan were medical employees of CCS and NYCCS" on the date in question, but cites only the Second Amended Complaint itself in support. (*See* Pl.'s

34

56.1 ¶ 6.)  Moreover, Defendants denied that allegation in their Response to Plaintiff's 56.1 as well as in their Answer to the Second Amended Complaint.  (*See* Defs.' 56.1 Resp. ¶ 6; Defs.' Decl. Ex. 39 ("Answer to SAC") ¶¶ 9–12.)  Having cited no admissible evidence in support of her Motion for Summary Judgment with respect to her respondeat superior claim, Plaintiff's Motion is denied.

### 3.  Breach of Contract

Both Parties move for summary judgment on Plaintiff's claim for breach of contract. Plaintiff argues that the "general denial of medical services" to Decedent, as well as the failure by CCS and NYCCS to adhere to their own policies regarding healthcare-related training and treatment protocols, establish as a matter of law that Westchester, CCS, and NYCCS breached the Agreement with respect to third party beneficiaries, including Decedent.  (*See* Pl.'s Mem. 17–19; Pl's Decl. Ex. X ("CCS Policies").)  On the other hand, Defendants argue that they are entitled to summary judgment on Plaintiff's breach of contract claim because the Agreement includes a negating clause that prevents third parties from enforcing its terms.  (*See* Defs.' Mem. 12–13.)  The clause provides: "This Agreement is intended only for the benefit of the parties hereto, not for any third parties."  (Agreement ¶ 15.)

"A third party seeking to recover on a contract must establish that a binding contract exists between other parties; that this contract was intended for his benefit; and that the benefit to him was direct rather than incidental."  *Internationale Nederlanden (U.S.) Capital Corp. v. Bankers Tr. Co.*, 689 N.Y.S.2d 455, 460 (App. Div. 1999); *see also Levin v. Tiber Holding Corp.*, 277 F.3d 243, 248 (2d Cir. 2002) (same).  A benefit is intended rather than incidental if it is "sufficiently immediate . . . to indicate the assumption by the contracting parties of a duty to compensate [the third party] if the benefit is lost."  *State of Cal. Pub. Emps.' Ret. Sys. v.*

*Shearman & Sterling*, 741 N.E.2d 101, 104 (N.Y. 2000). "Where performance is to be rendered directly to a third party under the terms of an agreement, that party must be considered an intended beneficiary." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991) (quotation marks omitted); *cf. Internationale Nederlanden,* 689 N.Y.S.2d at 460 (noting that a court must "look at the overall purpose of the transaction" in determining whether a third party has standing to enforce a contract). It is the burden of that party claiming to be an intended third-party beneficiary to demonstrate his or her right to enforcement. *See Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 336 (S.D.N.Y. 2005) (citing *Strauss v. Belle Realty Co.*, 469 N.Y.S.2d 948, 950 (App. Div. 1983), *aff'd,* 482 N.E.2d 34 (N.Y. 1985)). Additionally, "to state a breach of contract claim, the pleadings must allege the provisions of the contract upon which the claim is based and the defendant's acts or omissions constituting the breach." *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 457–58 (S.D.N.Y. 2012) (citations and quotation marks omitted)).

Although the Court found that the Amended Complaint had adequately alleged a third-party beneficiary breach of contract claim, (*see* Opinion 50–51), the Parties did not raise the negating clause in the Motion To Dismiss. Courts in the Second Circuit have readily reached the same conclusion under similar circumstances. Although previous courts have found similar contracts enforceable by inmates as third party beneficiaries, *see, e.g.*, *Zikianda v. County of Albany*, No. 12-CV-1194, 2015 WL 5510956, at *37 (N.D.N.Y. Sept. 15, 2015) (finding that, as a prior detainee, "[the] [d]ecedent was clearly an intended beneficiary of this contract, which requires the provision of medical care to detainees"); *Murns v. City of New York*, No. 00-CV-9590, 2001 WL 515201, at *5 (S.D.N.Y. May 15, 2001) (finding that "the inmates were the intended beneficiaries of the contract" whereby a medical provider "agreed to provide medical

services to the inmates of [c]ity correctional facilities"), no party in those cases raised a negating clause as a defense.

As Defendants observe, "courts within this Circuit have consistently held that even where a contract expressly sets forth obligations to specific individuals or categories of individuals, those individuals do not have standing to enforce those obligations by suing as third-party beneficiaries when the contract contains a negating clause." *Wilson v. Dantas*, 746 F.3d 530, 537 (2d Cir. 2014) (citation and quotation marks omitted); *see also Barton v. Smartstream Techs., Inc.*, No. 16-CV-1718, 2016 WL 2742426, at *5 (S.D.N.Y. May 9, 2016) ("Under New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well-established: 'Where a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, that provision is decisive.'" (alterations omitted) (quoting *India.com v. Dalal*, 412 F.3d 315, 321 (2d Cir. 2005))); *In re Lehman Bros. Holdings Inc.*, 479 B.R. 268, 275–76 (S.D.N.Y. 2012) (collecting cases), *aff'd*, 513 F. App'x 75 (2d Cir. 2013). Plaintiff fails to engage with Defendants' argument regarding the negating clause in either of her memoranda, and the Court finds no case law that would support carving out an exception to the effectiveness of a negating clause in a contract to provide medical services to prisoners. In fact, Plaintiff fails to cite any contractual language at all in support of her argument that Defendants breached the contract; that alone is fatal to her Motion. *See Dilworth*, 914 F. Supp. 2d at 457–58 (dismissing breach of contract claim where the plaintiffs did "not identify what provision of the contract was violated"). Plaintiff relies only on her own 56.1 Statement in support of her Motion, which in turn cites the Second Amended Complaint, rather than any admissible evidence, and on two CCS Policies, although it is not clear what relation, if any, the policies have to the Westchester-NYCCS Agreement, to which CCS is not a signatory. (*See* Pl.'s Mem.

18–19.) Although at the motion-to-dismiss stage Plaintiff argued that Defendants breached the Agreement by failing to provide required semiannual and annual reports to "allow Westchester to provide adequate oversight of the quality of care and staffing levels" at WCJ, (Opinion 51), she does not repeat that argument here, let alone substantiate it with evidence. The Court therefore grants summary judgment in favor of Defendants on Plaintiff's breach of contract claims.

## III. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied, and Defendants' Motion for Summary Judgment is granted in part and denied in part. The Clerk of the Court is respectfully requested to terminate the pending Motions. (*See* Dkt. Nos. 229, 230.)

SO ORDERED.

DATED:     March **5**, 2019
               White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE